# EXHIBIT A

HOFFMANN EITLE

HOFFMANN EITLE
Patent- und Rechtsanwälte
Partnerschaftsgesellschaft mbB

Arabellastraße 30
81925 München
Deutschland | Germany

T +49. (0)89. 92 409. 0
F +49. (0)89. 91 83 56

pm@hoffmanneitle.com
www.hoffmanneitle.com

HOFFMANN EITLE | Postfach 81 04 20 | 81904 München
European Patent Office

**80298 Munich**

Dr. James Ogle
jogle@hoffmanneitle.com

Dr. Joseph Taormino
jtaormino@hoffmanneitle.com

Munich, March 5, 2018

**Our Ref.:** **197 780 m10/m2/ohu**

**Opposition proceedings against**

**European Patent 2 575 835 B1 / 11 728 077.6**

**COMPOSITION FOR INDUCING PROLIFERATION OR ACCUMULATION OF REGULATORY T CELLS**

**On behalf of the Proprietor**

**THE UNIVERSITY OF TOKYO**
**3-1, Hongo 7-chome**
**Bunkyo-ku**
**Tokyo 113-8654 / JP**

MÜNCHEN
LONDON
DÜSSELDORF
HAMBURG
MILANO
MADRID

Hoffmann Eitle's professionals include:
European Patent Attorneys
Patentanwälte | German Patent Attorneys
Rechtsanwälte | German Attorneys at Law
British Patent Attorneys (regulated by IPReg)
Italian Patent Attorneys
Spanish Patent Attorneys
Dutch Patent Attorneys
Belgian Patent Attorneys
European Trademark Attorneys
European Design Attorneys

## Table of contents

1 Requests ....4
2 Documents filed by the Proprietor....5
3 Introduction ....6
4 The opposition by O2 is inadmissible ....9
5 Basis in the original disclosure and priority (Art. 100(c); Art. 87 EPC) ....9
5.1 Basis for claim 1 as granted ....9
5.1.1 Overview and central basis ....9
5.1.2 Foxp3-positive regulatory T cells ....11
5.1.3 Autoimmune disease, allergic disease....12
5.1.4 Infectious diseases....12
5.1.5 The spore-forming nature of bacteria of the invention....15
5.1.6 Clostridium clusters IV and XIVa in combination....18
5.1.7 The subject matter of claim 1 is entitled to the second priority date (Art. 87 EPC)....21
5.2 The dependent claims have basis and are entitled to priority ....24
5.2.1 Claim 2 ....24
5.2.2 Claim 4 ....25
5.2.3 Claim 7 ....26
5.2.4 Claim 8 ....26
5.2.5 Claim 9 ....27
6 Novelty....28
6.1 D1 (Atarashi *et al.*, 2011) and D2 (Honda *et al.*, 2011) are not prior art ....28
6.2 Claim 1 is novel over D3 (US 5,599,795)....28
6.2.1 D3 is not an enabling disclosure....29
6.2.2 No disclosure of the relevant effect underlying the claimed medical use....32
6.2.3 No disclosure of the relevant spore-forming subclass....34
6.3 Claim 1 is novel over D4 (Abrams) ....36
6.3.1 Lack of disclosure for bacterial preparations ....37
6.3.2 Lack of enablement for failure to render medical use credible ....39
6.3.3 No disclosure of the relevant effect underlying the claimed medical use....42
6.3.4 No disclosure of the relevant spore-forming subclass....44
6.4 Claim 1 is novel over D5 (Bakken) ....44
6.4.1 Limited technical quality and significance of D5 ....44
6.4.2 Novelty based upon a new technical effect ....45
6.4.3 The clinical situation according to D5 ....47

6.4.4 New clinical situation by virtue of the present invention ....51
6.4.5 The applicable case law....53
6.5 Claim 1 is novel over D6 (Borody et al.)....64
6.6 Claim 1 is novel over D49 (Aas *et al.*) ....66
6.7 Claim 1 is novel over D55 (Atarashi)....67
7 Inventive step....68
7.1 Introduction ....68
7.2 D8 as the closest prior art....69
7.3 Objective technical problem over D8 and its solution ....73
7.4 The claimed solution was not obvious over D8 ....75
7.5 Combinations with D8 do not render claim 1 obvious....77
7.6 Other approaches by the Opponents....79
7.7 Conclusion under Article 56 EPC ....82
8 Sufficiency of disclosure ....82
9 Conclusion....86
10 Auxiliary claim requests....86
10.1 Auxiliary Request 1 ....86
10.2 Auxiliary Request 2 ....87
10.3 Auxiliary Request 3 ....87
10.4 Auxiliary Request 4 ....87
10.5 Auxiliary Request 5 ....87
10.6 Auxiliary Request 6 ....88
10.7 Auxiliary Request 7 ....88

1 In response and with reference to the Opposition Division's communication of August 25, 2017, we herewith provide the Proprietor's response to the notices of opposition filed by Opponents 1-6 (O1-O6) as identified in the Opposition Division's communication.

## 1 Requests

2 The Proprietor requests that all oppositions be rejected.

3 The Proprietor requests that the opposition by O2 be rejected as inadmissible for lack of substantiation (Rule 76(c), 77(1) EPC).

4 The Proprietor requests maintenance of the opposed Patent (hereinafter: the Patent) as granted (Main Request).

5 Should the Opposition Division not allow the Proprietor's Main Request, it is requested that the Patent be maintained on the basis of one of Auxiliary Requests 1-7 as filed herewith.

6 For ease of reference, each of the Auxiliary Requests submitted herewith indicates the differences to the Main Request.

7 The Proprietor also requests the opportunity to file further auxiliary requests in order to address any further matter that may be identified in the course of the opposition proceedings.

8 In the interest of procedural efficiency, the opportunity is requested to be allowed to combine two or more of the Proprietor's present claim requests if that is expedient to the progress of the proceedings, and to be allowed to combine or delete claims in any of the Proprietor's present claim requests. The opportunity is also requested to adjust the order of the Proprietor's Auxiliary Requests.

9 Oral proceedings are requested prior to any decision by the Opposition Division that is adverse to the Proprietor.

10 At oral proceedings, the representatives for the Proprietor will speak in English and if any party uses a language other than English, simultaneous interpretation into English will be necessary.

## 2 Documents filed by the Proprietor

11 We file herewith a consolidated list of documents in the proceedings, in which the documents filed by Opponents 3-6 have been renumbered, in accordance with the order of the oppositions, as required in order to assign unique document numbers.

12 We also file the following further documents:

**D66** Certified translation of second priority document PCT/JP2011/063302 (filed 2010-12-03)

**D67** Cover page of the issue of *Science* containing D1 (vol. 331, January 21, 2011) with descriptive text as published

**D68** El Hage et al. (2017), Emerging trends in "smart probiotics": functional consideration for the development of novel health and industrial applications, *Frontiers in Microbiology* 8:1-11.

**D69** Rossi et al. (2016), "*Faecalibacterium prausnitzii* A2-165 has a high capacity to induce IL-10 in human and murine dendritic cells and modulates T cell responses", *Scientific Reports* 6:18507.

**D70** Foditsch et al. (2014), Isolation and characterization of *Faecalibacterium prausnitzii* from calves and piglets, *PLoS One* 9(12):e116465

**D71** Rosero et al., (2015) Reclassification of *Eubacterium rectale* (Hauduroy et al. 1937) Prévot 1938 in a new genus *Agathobacter* gen. nov. as *Agathobacter rectalis* comb. nov., … *Int J Syst Evol Microbiol*. 66(2):768-773 (Abstract)

**D72** Hata and Smith (2004), Blood group B degrading activity of *Ruminococcus gnavus* alpha-galactosidase, *Artif Cells Blood Substit Immobil Biotechnol*. 32(2):263-74 (Abstract)

**D73** Entry for *Ruminococcus* spp. on the online database "Microbe Wiki" (accessed January 1, 2018) https://microbewiki.kenyon.edu/index.php/Ruminococcus

**D74** Hansen and Nielsen (2015), Handbook of Animal Bacteriology, CRC Press, Boca Raton, p.158

**D75** Supplementary Table 1 ("Figure1_Cultures") of D14

**D76** Nitzan, et al. (2016), Role of antibiotics for treatment of inflammatory bowel disease, *World Journal of Gastroenterology* 22(3): 1078-1087

**D77** Rossen et al. (2015), Findings from a randomised controlled trial of faecal transplantation for patients with ulcerative colitis, *Gastroenterology* 149:110-118

## 3 Introduction

13 The invention disclosed and claimed by the present Patent is based upon the establishment of a link between specific types of gut bacteria, namely bacteria of Clostridium clusters IV and XIVa, and a specific effect upon patients' immune systems, namely the induction of proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells. This insight was of significant importance to both basic science and applied medicine. Initially, it represented a major breakthrough in terms of a fundamental understanding of the physiological roles played by gut microbiota. Further, this insight also has far-reaching therapeutic and clinical implications in terms of new medical uses.

14 The importance of the findings disclosed in the Patent to the scientific community is vividly underlined, e.g., by the fact that D1 in the present proceedings was featured on the <u>cover page</u> of the extremely prestigious journal *Science* (see D67). D1 is a scientific publication that corresponds to part of the experimental data in the Examples of the Patent. The present inventors are amongst the authors.

15 Further, as is demonstrated, e.g., by D29 (filed by O3), pharmaceutical compositions corresponding to the teaching in the Patent are indeed being developed successfully by Vedanta, the licensee of the patent, with partners.

16 The review article D68 which we file herewith, for example, also reflects the significance and current medical implications of the invention described in the present Patent.

In the section on page 6, entitled

> *"COCKTAILS OF* Clostridium *CLUSTER IV AND XIVA MEMBERS"*,

D68 summarises (citing and taking into account the teaching in D1 and thus in part also of the Patent):

> *"... Tregs can regulate immune homeostasis and serve as a therapeutic target for different gut inflammatory disorders. Induction of the colonic Tregs is dependent on special properties of our commensal bacteria. Clostridium spp. belonging to clusters IV and XIVa (also known as Clostridium leptum and coccoides groups, respectively) are exceptional inducers of Tregs in the colon and can be considered as therapeutic options for IBD and allergies (Atarashi et al., 2011)* [i.e., D1] *..."*
> [emphasis added].

17 Regarding the development of effective novel treatments on the basis of the association of Clostridium clusters IV and XIVa with the specific effect upon Foxp3-positive Tregs as described and claimed by the present Patent, D68 in column 2 of page 6 also reports:

> *"... formulations including strains belonging to Clostridia classes IV and XIVa were designed to modulate the immune response (Atarashi et al., 2013). The original community of 17 strains (VE202) was developed by Vedanta Biosciences and Johnson and Johnson* [i.e., holders of rights under the present Patent]*, and has provided an effective treatment for autoimmune disorders..."*

18 After the first, fundamental breakthrough represented in the Patent and in part in D1, additional, more specific work by the authors of D1 and collaborators focused, inter alia, upon various specific combinations of strains. That subsequent work, while also providing additional inventions which are patentable in their own right, was in line with the groundbreaking teaching of the present Patent. It was in part also published, e.g., in one of the most prestigious peer-reviewed journals, i.e., *Nature* (D16 in the present proceedings, cited as "*Atarashi et al., 2013*" in the above quote from D68).

19 The invention claimed by the present Patent was a fundamental breakthrough, a "game changer" which opened the door to a new clinical situation for the treatment of various diseases, compared to prior-art approaches. As will be seen in more detail in the discussions of novelty and inventive step, previous therapeutic approaches based upon the concept of administering gut bacteria involved approaches such as "*fecal microbiota transplantation*" or "*FMT*", a medical procedure that involves crude transfers of voluminous samples of whole human stool into patients.

20 As will be seen, the prior-art approach of "FMT" required a highly disadvantageous, inconvenient, lengthy, unpleasant and, not least, fundamentally dangerous procedure of administering human faeces to patients, which was, in comparison, not based upon any sound science in the sense of a recognised, controllable technical effect, and led to inconclusive results. This approach was commonly recognised in the field to be effective only for recurring *C. difficile* infections. Quite aside from the inconvenience, discomfort, duration and cost of stool transfers, one particular health risk arising from such procedures was the transfer of unrecognised pathogens in donors' stool (see, e.g., the observations in this regard in D68, page 3, column 2, lower part of the first paragraph: "*theoretically, any disease phenotype from the donor can be transferred to the patient… the uncharacterised nature of FMT may result in undetected for unmonitored risk factors such as viruses, pathogens or even allergens being passed to the FMT recipient, causing disease …*"). FMT overall represents an extremely disadvantageous and indeed entirely undesirable clinical situation.

21 The FMT approach, with all of its disadvantages and risks, was "suffered", as an experimental procedure, by patients and caregivers alike, because no therapeutically relevant effect had been attributed to any concretely identifiable component of human faeces.

22 Only the scientifically sound establishment of such a link between identifiable gut bacteria and a defined, therapeutically relevant effect allows for a safer, more effective, cleaner, better controllable and standardisable approach than, e.g., FMT (see also, e.g., the further comments in D68, page 4, column 1, and page 7, column 2 under "*Medical Application*" and "*Conclusion*" on the advantages of defined bacterial compositions).

23 It is this link which the Patent provides, namely between bacteria of Clostridium clusters IV and XIVa and the specific immunological effect of inducing Foxp3-positve regulatory T cells, thus creating an entirely new clinical situation and enabling genuinely new medical uses of various types. This invention is defined in the claims of the Patent.

## 4 The opposition by O2 is inadmissible

24 O2 has not substantiated the opposition. The opposition by O2 contains no specific facts and arguments whatsoever, and instead only a sweeping, blanket reference to facts and arguments filed by O1. This is not sufficient to substantiate an opposition in its own right, and therefore does not satisfy the requirements of Rule 76(1)(c) EPC. Accordingly, the opposition by O2 is to be rejected as inadmissible in accordance with Rule 77(1) EPC.

## 5 Basis in the original disclosure and priority (Art. 100(c); Art. 87 EPC)

25 The Opponents allege that the features of claim 1 as granted do not have basis in the original disclosure in combination, and further that individual features lack basis as such. These objections are raised both in respect of the application as originally filed and the second priority application.

26 These objections are unfounded. Claims 1-9 as granted have basis both in the application as originally filed and in the second priority application, for the reasons explained herein below.

27 In order to avoid unnecessary repetition, in the following, passages of the second priority application (and its translation D66) will be cited and discussed in conjunction with the corresponding passages in the application as originally filed.

### 5.1 Basis for claim 1 as granted

#### 5.1.1 Overview and central basis

28 Claim 1 relates to –

- A composition
- for use in a method of treating or preventing a disease selected from infectious disease, autoimmune disease or allergic disease in an individual
- the composition comprising, as an active ingredient, bacteria
- comprising spore-forming bacteria
- belonging to Clostridium clusters IV and XIVa in combination

- which combination induces proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells in said individual.

29 Relative to the original disclosure of the application as filed and the second priority document, this subject matter consists simply of a composition according to the most fundamental, central "core" of the original disclosure, which is further defined in terms of uses, structure and function by certain "core" preferred features. These latter features are clearly presented in the original disclosure as being particularly relevant and entirely generically applicable to any composition of the invention.

30 The first sentence of application as filed (page 1, lines 6-9) discloses, on a fundamental, general level, that the "*invention relates to a composition*" having one core functional and one core structural feature according to claim 1, namely which –

- "*has an effect of inducing proliferation or accumulation of regulatory T cells*"

  and

- "*comprises, as an active ingredient, bacteria belonging to the genus Clostridium*",

  respectively.

31 The same disclosure is provided in paragraph [0001] of the second priority application, i.e., page 1, lines 7-10 of the corresponding English translation D66.

32 This provides the foundation of the basis for the composition of claim 1.

33 The skilled person would also recognise that the above-mentioned disclosure of page 1, lines 6-9 of the application as filed ([0001] of D66) is identical to, e.g., to that of page 7, lines 20-25 ([0011]/page 6, lines 15-19 of D66).

34 We note that, contrary to the view of certain Opponents, the fact that "*bacteria belonging to the genus Clostridium*" appears, e.g., on page 7, line 25, as an option "*(a)*", most certainly does not imply that this subject matter presents a "selection from a list of some length" within the meaning of the case law of the Boards of Appeal. This feature does not fall within the scope of the case law on undisclosed selections from lists of some length, i.e., the case law going back to T 12/81.

35 The Opponents' suggestion that the "Clostridium" aspect of claim 1 contravenes such case law is clearly incorrect, already because this subject matter evidently corresponds to the fundamental "core" of the entire disclosure which is disclosed in the very first sentence of the application (page 1, lines 6-9). Fully consistent with this fact, the extensive further disclosure relating to this subject matter in the remainder of the application, when considered as a whole, further underlines that this subject matter is absolutely central to the technical subject matter of the original disclosure of the claimed invention. Such subject matter cannot be considered as a selection which might be potentially "surprising" to the skilled person in view of the original disclosure, and cannot therefore contribute to a relevant list within the meaning of the case law.

36 Further, with only two further options, even the list in which this aspect of the application is also featured as option "*(a)*" is not a list "*of some length*" within the meaning of the case law. Thus, also for this reason, the "Clostridium" aspect of claim 1 clearly does not contribute to any unallowable "selection" within the meaning of the established case law of the Boards of Appeal (cf., e.g., T 12/81, point 13 of the reasons; T 401/94, point 4.4 of the reasons; T 806/02, point 4.1 of the reasons, requiring a list "*of some length*").

37 As will be discussed in more detail below, the remaining features of claim 1 are also disclosed both in the application as originally filed and in the second priority document entirely generically and in a manner that makes directly and unambiguously clear that the remaining features are also core, preferred features of a composition as claimed and its uses. No subject matter is added by the further characterisation of the composition by any of the core features as recited in claim 1. Claim 1 does not, overall, present the skilled person with any new information relative to the original disclosure, neither in the form of any undisclosed "selection" nor otherwise.

### 5.1.2 Foxp3-positive regulatory T cells

38 The further specification of the effect on regulatory T cells mentioned above as "*inducing proliferation or accumulation of <u>transcription factor Foxp3-positive</u> regulatory T cells*" is disclosed specifically by the combination of the basic disclosure regarding "*inducing proliferation or accumulation of regulatory T cells*" e.g. on page 1, lines 7-8, with <u>page 28, lines 7-11</u>, of the application as filed. The latter passage further defines the "*regulatory T cells of which proliferation or accumulation is*

*induced by the composition of the present invention*" as "*preferably transcription factor Foxp3-positive regulatory T cells*". The same disclosure of this preferred feature is found in paragraph [0017] of D66.

### 5.1.3 Autoimmune disease, allergic disease

39 The application as filed discloses on page 33, lines 20-22 and 25, in an entirely generic manner, that "[t]*he composition of the present invention*" can be used for pharmaceutical purposes, namely, in particular "*for preventing or treating an autoimmune disease or allergic disease*", or "*an allergic disease*". This is, in effect, disclosed once again and thus highlighted on page 34, lines 5-7. The same disclosure is provided in paragraphs [0026] and [0027] of D66.

### 5.1.4 Infectious diseases

40 The Opponents have alleged, in particular, that the prevention or treatment of infectious diseases lacks basis in the application as filed. However, the application provides basis also for this use considering, e.g., page 37, lines 18-23, page 57, lines 12-20, and page 59, lines 6-16 (which are identical to [0028], [0066] and [0069] of D66, respectively).

41 Page 37, lines 18-23, of the application as filed and [0028] of D66 recite that

> *"The composition of the present invention can also be used as a pharmaceutical composition for preventing or treating infectious diseases in an individual whose resistance to the infectious diseases is impaired because of damage due to excessive inflammation caused by the immunity."*

42 This passage, especially when read in its technical context, i.e. through the eyes of the skilled person and in the context of the application as a whole, discloses the treatment or prevention of infectious diseases as recited in claim 1.

43 The Opponents make much of the fact that this passage contains some further, purely descriptive references to the individual, namely that the individual's "*resistance to the infectious diseases is impaired because of damage due to excessive inflammation caused by the immunity*". But if this disclosure is considered through the eyes of the skilled person and further in the context of the application as a whole, it is clear that no added subject matter is in fact generated relative to this disclosure by the wording of claim 1.

44 Even considering only this passage alone, the skilled person would recognise that the above passage to which the Opponents have referred is in essence purely descriptive background information and not essential for the definition of the invention in claim 1.

45 The skilled person considering this passage would be aware from a technical point of view that, if the individual's resistance to infectious diseases were not impaired, the individual would not have (or be susceptible to) the infectious disease in the first place. Inflammation is a normal, undesirable consequence of infectious diseases, which is addressed by therapy or prevention of infectious diseases. Further, inflammation in the case of an infectious disease is generally "*caused by the immunity*", i.e., by an immunological reaction to the infection. Also, any such inflammation is inherently "*excessive*", because the healthy physiological state is non-inflamed. The skilled person reading this passage would immediately understand that an infected individual has an immune response which causes inflammation relative to the normal, non-inflamed physiological state (and is therefore "*excessive*"), because this is also an entirely normal consequence of any infection that may become manifest as a "*disease*".

46 Thus, no new or other information is generated from the perspective of the skilled person if the claim simply refers to treating or preventing infectious diseases.

47 Moreover, the therapeutically relevant mechanistic aspect of combating inflammation is in any event reflected in claim 1 as granted – in a more specific form, namely by the reference in the claim to inducing proliferation or accumulation of Fox3-positive regulatory T cells.

48 For these reasons alone, contrary to the allegations of the Opponents, it is not necessary to include the additional language of page 37, lines 21-23 concerning the individual in the claim.

49 Moreover, the original disclosure also includes other passages which, both in conjunction with the disclosure discussed above and independently, further support the wording of granted claim 1 in respect of infectious diseases. Page 37, lines 18-23, of the application as filed and the corresponding passage [0028] of D66 must also be read in this further context.

50 In particular, at page 57, lines 12-20, of the application as filed (and, identically [0066] of D66) discloses that the "*individual*" according to the invention (as also mentioned on page 37, line 20) may be in a "*diseased state"* in that, for example, the individual is *"suffering from an infectious disease*" without further limitation. Page 57, line 17 expressly discloses that the "*diseased state"* is generally "*not particularly limited*".

51 This disclosure provides basis for reciting "*infectious disease*" as in granted claim 1, because the skilled person reading this disclosure and the application as a whole in its technical context would recognise directly and unambiguously that any "*disease state*" which is disclosed for "*the individual*" according to the application is of course also to be treated by administration of the compositions of the invention, which are for "*pharmaceutical*" purposes (see also, e.g., page 8, lines 15-17 and 10 of the application and identically [0011]/page 7, lines 4-5 of D66).

52 Thus, the skilled person would directly and unambiguously derive from the disclosure discussed above, in its technical context which includes both skilled person's background knowledge and the application as a whole, that a "*composition*" according to the original disclosure is contemplated simply for use in treating or preventing "*infectious disease*", fully in accordance with the wording of claim 1.

53 Moreover, page 59, at lines 6-7 and 10-11, within the context of the passage of page 59, lines 6-16 ([0069] of D66), also states expressly that, firstly,

> *' "autoimmune diseases" are not particularly limited'* (lines 6-7)

and, secondly,

> *'the "infectious diseases" are also not particularly limited'* (lines 10-11).

54 This latter disclosure is found in a passage (page 59, lines 6-16) relating to an aspect termed "*vaccine composition*". But this does not limit its significance in the context of the compositions of the present claims, because the skilled person will note directly und unambiguously that, specifically with regard to the nature of the "*infectious diseases*", the passage includes an express cross-reference to the section "*<Composition Having Effects of Inducing Proliferation or Accumulation of Regulatory T cells>*" (page 59, lines 13-16). That section is found on pages 37-38, i.e., in the part of the specification relating to the disclosure of page 37 discussed in paragraphs 41-

48 above, and relates to "*example*[s] *of infectious pathogens*" which are in any case relevant, entirely generically, to any composition according to the application, including compositions according to the present claims.

55 Also in view of this cross-reference to the entirely generic passage of pages 37-38, this disclosure provides further supports the conclusion that the skilled person would directly and unambiguously understand that the application as a whole in effect relates to a single concept of "*infectious disease*". As is expressly stated on both pages 57 and 59, that disclosure relating to the term "*infectious disease*" is "*not particularly limited*", and certainly does not necessarily include the further wording found only in the passage of page 37 as discussed in paragraphs 41-48 above.

56 The skilled person could only conclude that the way in which "*infectious diseases*" are disclosed in the application as filed and D66 is, in that respect, entirely equivalent to, e.g., "*autoimmune diseases*", in that each of these types of diseases is "*not particularly limited*".

57 Thus, the passage on page 59, lines 6-16, overall simply further corroborates the conclusion the skilled person would already draw directly and unambiguously based upon the disclosures of pages 37 and 57 as discussed above, i.e., that the application relates to the treatment and prevention of infectious diseases in a way that does not require further language from the passage of page 37 to be recited.

58 By the established standard of disclosure it is thus entirely permissible and sufficient in claim 1 to recite "*infectious diseases*" as such, without the further, purely descriptive wording on page 37 to which the Opponents have referred. The skilled person would directly and unambiguously derive the treatment or prevention of "*infectious diseases*" as recited in claim 1 from the original disclosure as a whole when interpreted in a technically sensible manner, particularly taking into account the passages discussed above on pages 37 (lines 18-23), 57 (lines 12-20) and 59 (lines 6-16) of the application ([0028], [0066] and [0069] of D66, respectively).

### 5.1.5 The spore-forming nature of bacteria of the invention

59 The Opponents have objected to the term "*spore-forming*" in claim 1, alleging in particular that in the original disclosure this term is contemplated only for specific uses. The Opponents thus take the position that the skilled person would, allegedly, not understand from the original disclosure that "*spore-forming*" is a property characterising the bacteria according to the application as such and in general. The

Opponents believe that the skilled person would derive from the application that the bacteria have this property only in the context of certain uses, but not in the uses of claim 1.

60 The Opponents' position is incorrect. The skilled person would derive directly and unambiguously from the original disclosure that the property of being "*spore-forming*" is a preferable feature regarding the nature of bacteria which are of particular interest according to the application as a whole, in a general sense that is not only limited to particular uses.

61 Page 46, lines 22-24 ([0046] of D66) discloses expressly that a "*composition of the present invention*" is associated with an "*advantageous nature of forming spores*". This "*nature*" is inherent to the bacteria of the composition according to the application, and is not tied for technical reasons only to uses mentioned on page 46.

62 The "*composition of the present invention*" in this context is clearly the basic composition which is defined according to, e.g., page 1, lines 6-9 ([0001] of D66), in that it contains at least "*as an active ingredient, bacteria belonging to the genus Clostridium*" which furthermore "*has an effect of inducing proliferation or accumulation of regulatory T cells"*. According to the original disclosure a whole, this composition can be put to various uses. Page 46 of the application as filed illustrates some of those uses, pointing out that, for example, the composition is particularly suitable for incorporation into processed foods "*because of an advantageous nature of forming spores*" (line 22).

63 This directly and unambiguously discloses at least two things in regard of the composition: on the one hand, an "*advantageous nature of forming spores*", and on the other hand, a use of bacteria having this "*advantageous nature*" in processed foods. These two disclosures are separable.

64 This "*advantageous nature*" is, as the skilled person would understand, of course disclosed here as an inherent, general property of the bacteria in the composition. It characterises the bacteria as such, not only their intended use. In the context of page 46, lines 22-24 of the application as filed, the spore-forming "*nature*" of the bacteria in the "*composition of the invention*" is technically entirely independent of the intended use. The bacteria in the composition which this passage discloses are necessarily also characterised by their spore-forming "*nature*" if they are intended for other uses, including the uses according to present claim 1. Because the

application refers to an inherent "*nature*" of the bacteria, the skilled person would recognise that this property as disclosed on page 46, line 22 characterises the bacteria in the "*composition of the invention*" regardless of which specific technical role the spore-forming property might play (e.g., which particular advantage it may confer upon the composition), in any given use.

65 Thus, the more specific disclosure regarding a use in processed foods which is also included in this passage on page 46, is therefore clearly <u>separable</u> from the disclosure on a more general level that is also contained within that passage, namely of the general "*nature*" of "*the composition of the present invention*" <u>as such</u>, which is a "*nature of forming spores*".

66 Thus, the application as filed directly and unambiguously discloses "*spore-forming bacteria*" as the bacteria which are the active ingredient of the composition of the invention.

67 We add that page 31, lines 2-3, of the application as filed ([0019] of D66) is entirely consistent with this position and indeed provides further relevant basis in this regard. This passage discloses that bacteria in a composition according to the invention "*are preferably in the form of spore*[s]".

68 While this statement expressly discloses bacteria "*in the form of spores*", the expression "*preferably*" also underlines that it is only optional for any bacteria which are capable in principle of forming spores due to their <u>general nature</u> actually to be present in that form in the composition. This further underlines the clear disclosure on page 46, line 22, as discussed above, that bacteria for use in the compositions according to the invention are contemplated as being of a spore-forming "*nature*" quite in general. The conclusion that the disclosure on page 46, line 22, about the general nature of the bacteria applies to compositions according to the original disclosure in general, including those of present claim 1, is thus fully consistent with the statement on page 31, lines 1-2, that the bacteria for use in the compositions may <u>optionally</u> (preferably) be "*in the form of spores*".

69 Moreover, the clear focus upon spore-forming bacteria in the Examples lends further weight to the disclosure discussed above in the generic part of the description. This yet further confirms that the subject matter of the original disclosure is indeed concerned, in particular, with the spore-forming nature of the subset of bacteria that is of particular interest (see, e.g., Example 6, page 82, lines 7-9: "*the spore-forming*

*fraction played an important role in the induction of Treg cells*"; also Example 18, page 106 and 108).

70 In conclusion regarding the feature "*spore-forming bacteria*", the application as filed directly and unambiguously discloses such bacteria as the active ingredient of the composition of the invention. This feature does not generate any new information in claim 1.

**5.1.6 Clostridium clusters IV and XIVa in combination**

71 The Opponents' allegation that the original disclosure does not provide basis for the feature "*Clostridium clusters IV and XIVa in combination*" is incorrect. This allegation is based upon a biased, incomplete and artificial interpretation of the passage of page 28, line 12, to page 29, line 1, of the application as filed ([0018] of D66).

72 This passage at page 28, lines 12-14, initially refers to the expression "*bacteria belonging to the genus Clostridium*" which, as already mentioned above, is also employed in the fundamental basis for the compositions of the invention, e.g., on page 1, lines 6-11, and page 7 lines 20-25, of the application. Page 28, lines 13-14, also mentions that these bacteria are "*the active ingredient in the composition of the present invention*".

73 The following passages of page 28 link the expression "*bacteria belonging to the genus Clostridium*" to further definitions of these active bacteria of the composition within the meaning of the original disclosure – in particular to definitions based upon the Clostridium clusters as recited in claim 1. The passage of page 28, line 12, to page 29, line 1, as a whole makes directly and unambiguously clear to the skilled addressee that within the meaning of the original disclosure the Clostridium cluster-based definitions are contemplated as standing in the place of the expression "*bacteria belonging to the genus Clostridium*" for the purposes of defining the invention.

74 Therefore, contrary to the view of certain Opponents, it is clearly not necessary for the expression "*bacteria belonging to the genus Clostridium*" to appear in claim 1. The specific further definitions based upon Clostridium clusters replace this expression in the subject matter of claim 1 with basis ultimately on page 28, line 12, to page 29, line 1, of the application as filed, as will be discussed in further detail below.

75 Page 28 at lines 14-16 initially discloses that the bacteria are "*not particularly limited as long as the bacteria have the effect of inducing proliferation or accumulation of regulatory T cells*". Thus, this effect is central.

76 The following sentence at lines 16-17 discloses that such "*bacteria preferably belong to the cluster XIVa or the cluster IV*". This firstly directly and unambiguously associates each of Clostridium clusters XIVa and IV with the above-mentioned effect of interest. Secondly, this also highlights that each of these clusters is preferable.

77 For this reason alone, no new information whatsoever is generated if according to claim 1 the claimed composition is characterised by bacteria from each of these preferable clusters.

78 To the contrary, we note immediately that a new technical meaning without basis in the original disclosure would indeed artificially be imparted upon this paragraph, if the paragraph were to be interpreted as selectively as the Opponents suggest, i.e., effectively as teaching that Clostridium clusters XIVa and IV are in some way mutually exclusive, so that the characterisation of a composition by both of the preferred clusters would allegedly somehow generate new information. That interpretation is not consistent with the overall disclosure in this paragraph and the skilled person's technically informed and reasonable approach to the interpretation of patent documents. This selective interpretation that is favoured by the Opponents is incorrect because it ignores that according to the application each of the two clusters is expressly preferred, and nothing whatsoever in the application provides a technical reason to assume that the composition should contain only one type or cluster of bacteria, or that either one or the other of the preferred features is available as part of the composition.

79 For the avoidance of all possible doubt and for completeness, we add that the singling out of merely two alternatives as preferred on no account amounts to a list "*of some length*" within the meaning of the case law of the Boards of Appeal on selections from lists (cf., e.g., T 12/81, point 13 of the reasons; T 401/94, point 4.4 of the reasons; T 806/02, point 4.1 of the reasons, requiring a list "*of some length*"). Such case law is on no account applicable to the highlighting of both Clostridium clusters XIVa and IV as being preferred in the present case.

80 From the perspective of the disclosure standard that applies to the assessment of claim amendments under the EPC, the features Clostridium clusters XIVa and IV are

in fact no different from any other two compatible features which are singled out individually as typical, preferred features of the invention. Absent any technical or other reason to the contrary, the invention as claimed may be characterised by each of the compatible features without generating added subject matter. That is true regardless of whether two such preferred features are disclosed concisely in the same sentence using the conjunction "*or*" (as, e.g., on page 28, lines 16-17), or, e.g., more repetitively, simply in two equivalent independent sentences, as in the following, rephrased illustration.

> *"The bacteria preferably belong to the cluster XIVa. The bacteria preferably belong to the cluster IV."*

81 Also on this basis, clearly either one or both of the two recited clusters could be selected for further characterisation of the composition in question without being deemed to generate added subject matter. The effective disclosure under the applicable standard of the EPC is the same, regardless of whether one or two sentences are used. Both clusters are preferred, and this alone implies directly and unambiguously that either one or both of them can be used in a composition of the invention without generating any added subject matter.

82 In any event, the remainder of this passage up to page 29, line 1 provides further relevant disclosure relating to combinations of different types of such bacteria, which provides direct and unambiguous basis for the combination of clusters XIVa and IV as recited in claim 1. In this regard it suffices to consider that the application at page 28, lines 22-33 once again mentions clusters XIVa and IV, and then goes on to disclose at page 28, line 24 to page 29, line 1 that –

> *"In addition to the bacteria belonging to these clusters, bacteria belonging to other clusters … can also be used in combination"* (underlining particularly relevant terms added).

83 In this statement, the plural expression "*these clusters*" directly and unambiguously refers to the two clusters mentioned in the preceding sentence (and before that three sentences earlier), i.e., both clusters XIVa and IV.

84 By going on to state that "*other clusters*" can "***also*** *be used in combination*" this statement by implication also necessarily discloses nothing else than that "*these clusters*" (XIVa and IV), can be used "*in combination*".

85 By virtue of the back-reference to "*these clusters*", in this disclosure, a combination of clusters XIVa and IV is expressly the initial point of reference to which, in a further embodiment, "*other clusters*" may "*also*" be added in combination. The term "*also*" underlines to the skilled person reading this disclosure in its literal and technical context that the initial point of reference for the statement of page 28, line 24 to page 29, line 1 is already a "*combination*" of clusters, namely the combination of clusters XIVa and IV.

86 This disclosure is entirely consistent with the conclusion already drawn above on the basis of page 28, lines 16-17, that both of these clusters are clearly disclosed as being preferred and can for that reason alone both be selected for use in the composition, i.e., for use in combination.

87 Thus, by implication, this passage overall directly and unambiguously discloses the use of clusters XIVa and IV in combination as the bacteria which are the active ingredient of the composition.

88 Finally we note that, as bacteria of "*Clostridium clusters XIVa and IV in combination*" are disclosed generically as the active ingredient of the composition of the invention (cf. page 28, lines 12-14 in combination with page 1, lines 8-10), the application as filed also directly and unambiguously links this "*combination*" to the feature of "*inducing proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells*" that is generically disclosed, e.g., on page 1, line 7-8 and page 28, lines 7-11 in combination.

**5.1.7 The subject matter of claim 1 is entitled to the second priority date (Art. 87 EPC)**

89 As has already been demonstrated above, the subject matter of claim 1 has sound basis in the passages of the second priority document / D66 already cited above, just as in the corresponding passages of the application as filed, which disclose the same subject matter. The Opponents have merely referred to passages of the second priority document which are less relevant than those discussed above, or have interpreted the relevant passages of the second priority document in a selective and incorrect manner.

90 The Opponents' allegations of lack of priority are therefore incorrect, just as the Opponents' allegations that the claimed subject matter lacks basis in the application as filed. The subject matter of claim 1 is entitled to the second priority date.

91 Two Opponents (O1 and O6) also allege, incorrectly, that the subject matter of claim 1 lacks entitlement to priority for lack of enablement of the second priority document, because further details and experimental examples were included in the application as filed. O6, for example, writes that the second priority document "*does not provide any evidence of the teaching associated with the use of Clostridium strains of cluster IV or of cluster XIVa …*", alleging that the invention in the second priority document is "incomplete" (see page 16 of O6's statement of opposition).

92 This view is also incorrect. Just as the passage of page 28, line 12, to page 29, line 1, of the application as filed, paragraph [0018] of the second priority document, as already cited above, provides sound basis and a clear technical teaching regarding Clostridium clusters IV and XIVa and their technical benefits. As can be seen at page 20, lines 11-17 of D66, the second priority document teaches that –

> *"The bacteria preferably belong to the cluster XIVa or the cluster IV. … The use of multiple strains of bacteria belonging to the cluster XIVa or the cluster IV in combination can bring about an excellent effect on regulatory T cells."*

93 Fully in accordance with this teaching, as already explained in detail above, the subsequent sentence of this passage in combination with the two sentences cited above discloses, by implication but directly and unambiguously, that bacteria of cluster XIVa and IV are to be used in combination:

> *"In addition to the bacteria belonging to these clusters, bacteria belonging to other clusters … can also be used in combination."*
>
> (page 20, lines 17-19 of D66, underlining added).

94 As already mentioned, in the sentence the expression "*these clusters*" directly and unambiguously refers to nothing else than clusters XIVa and IV in combination. That teaching is entirely consistent from a technical point of view with the preceding teaching according to which the each of these clusters is preferred and these particular two clusters allow an "*excellent effect on regulatory T cells*" to be achieved.

95 If any Opponent seriously wished to call into question the entitlement to the second priority date under the aspect of enablement, the same, well-established legal

standard and burden of proof would apply as for any objection by an Opponent under Article 100(b) EPC:

> *"Only if there are serious doubts, substantiated by verifiable facts, may an application be objected to for lack of sufficient disclosure"*
>
> (T 19/90, OJ EPO 1990, 476, point 3.3 of the reasons).

96 The Opponents, who carry the burden of proof when raising such an objection, have not met this legal standard or discharged their burden of proof in this regard. The Opponents have not substantiated to the required standard that the teaching of the second priority document is "*incomplete*" or non-enabled in any concrete way that is relevant to the entitlement of claim 1 to the second priority date.

97 The second priority document provides a clear, credible teaching specifically that bacteria of clusters XIVa and IV, as such and in combination, are of particular interest and benefit for achieving the relevant effects on regulatory T cells according to the original disclosure. This teaching is neither incomplete, nor has any Opponent established any concrete, serious doubt, substantiated by verifiable facts, regarding this technical teaching, to the extent that it would be reasonable to call into question the entitlement of the claimed invention to the second priority date.

98 The skilled person by the second priority date was well aware of bacteria of Clostridium clusters XIVa and IV, and was readily able to obtain and identify such bacteria. The classification and identification of bacteria based, e.g., upon 16S rRNA sequences had been common practice for many years before the second priority date. See, e.g., the examples of this practice provided by D22 (page 813, column 1), the introduction to D9 (page 2089, column 1), and D28 (page 2, column 2, last two paragraphs). In D28, e.g., the bacteria identified in this way expressly include bacteria of "Clostridium clusters IV and XIVa" (page 2, column 2, last paragraph, Table 2, Fig. 2).

99 In the present Patent, the mere fact that additional experiments which further corroborate this teaching in the second priority document were carried out and included in the application underlying the Patent does not cast doubt upon the entitlement of the claimed invention to the second priority date. The experimental data in the additional examples of the Patent only further corroborate the clear and

credible teaching of the second priority document regarding the focus upon Clostridium clusters XIVa and IV for use in compositions according to the claimed invention.

100 We further emphasise that the Proprietor of the Patent is entitled to the benefit of the doubt on questions of enablement, as long as the Opponents have not discharged their evidential burden of establishing a concrete, serious doubt as to the enablement of the patent substantiated by verifiable facts. In any event, in the present case, no such doubts exist with regard to the clear teaching in the second priority document, and the additional, more detailed experimental data in the Patent only confirms that no such doubt would be justified.

101 Thus, the subject matter of claim 1 is entitled to the second priority date.

## 5.2 The dependent claims have basis and are entitled to priority

102 Only O5 considers that the dependent claims relate to added subject matter.

### 5.2.1 Claim 2

103 Claim 2 has basis on page 34 of the application as filed (see in particular lines 7-11), and in the identical passage of paragraph [0027] of the second priority application / D66. O5 alleges that this claim contains added subject matter in the sense of a "selection". That view of claim 2 is incorrect.

104 It is well established by the case law of the Boards of Appeal that a mere "shrinking" of lists covering a generic area of subject matter to reflect a smaller generic area is allowable under Articles 123(2) and 100(c) EPC if –

- firstly, the deletion does not result in singling out any hitherto not specifically mentioned individual elements, but maintains the remaining subject-matter as a generic group of elements differing from the original group only by its smaller size; and

- secondly, the deletion does not lead to a particular combination of a specific meaning which was not disclosed originally, i.e., it does not generate another invention, or in other words it merely restricts the required protection but does not provide any technical contribution to the originally disclosed subject-matter.

See T 1506/07, point 4.2 of the reasons. Case T 1506/07 itself was concerned with different factual circumstances such that, in that case, these conditions were not satisfied. For cases in which these conditions were satisfied, see, e.g., T 888/08, point 3.2 of the reasons; T 615/95, point 6 of the reasons.

105 These conditions are clearly met in the present case by the group of diseases recited in dependent claim 2. For example, in T 1506/07 the invention was defined primarily by the elements of the list in question (the genes to assay for in order to draw a certain diagnostic conclusion). In contrast, in the present case, the invention is a further / specific medical use according to Articles 53(c) and 54(5) EPC, and is defined particularly by the technical effect of inducing accumulation of proliferation of Foxp3-positive regulatory T cells and the recognition that this effect is associated specifically with bacteria of Clostridium clusters IV and XIVa. It is that combination of technical features – the specific effect upon regulatory T cells and its attribution to specific types of bacteria – which makes possible the specific therapeutic use as claimed in claim 1. The diseases recited in claim 2 are merely typical diseases to which that specific therapeutic use may be applied.

106 Hence, fully in accordance with the requirements of the case law cited above, the subject matter of claim 2 both

- maintains the remaining subject-matter as a generic group of elements differing from the original group only by its smaller size, and

- does not generate another invention, or in other words it merely restricts the required protection but does not provide any technical contribution to the originally disclosed subject-matter

107 Claim 2 therefore does not relate to added subject matter.

### 5.2.2 Claim 4

108 O5 also considers that claim 4 relates to added subject matter, allegedly because the application as filed does not disclose bacteria of clusters IV, XIVa and a further cluster in combination. However, such a combination is directly and unambiguously disclosed by page 28, line 24 to page 29, line 1 of the application as filed and in the identical passage of paragraph [0018] of D66. This passage provides basis for the combination according to claim 4, because it discloses that "[i]*n addition to the bacteria belonging to these clusters*" – i.e., Clostridium clusters IV and XIVa to which

the previous two sentences starting at page 28, lines 16 refer – *"bacteria belonging to other clusters (for example, bacteria belonging to the cluster III) can also be used in combination"*.

109 Further, page 28, lines 18-19, of the same paragraph of the application as filed and D66 disclose generically, for any "*bacteria … used for the composition of the present invention*", that –

> *"One strain of the bacteria alone can be used for the composition of the present invention, but two or more strains of the bacteria can be used together for the composition of the present invention."*

110 The technically informed skilled person reading this paragraph in its technical context would directly and unambiguously understand that this statement clearly applies to any "*bacteria … used for the composition of the present invention*" that are mentioned in the paragraph in question, i.e., both to "[t]*he bacteria*" of Clostridium clusters IV and XIVa which are mentioned as being preferred in the preceding sentence and to "*the bacteria*" belonging to other clusters which are mentioned as possible additions to the combination subsequently.

111 Thus, claim 4 does not relate to added subject matter.

### 5.2.3 Claim 7

112 O5 also alleges, incorrectly, that claim 7 relates to added subject matter. Claim 7 in fact has express basis on page 31, lines 2-3 of the application as filed (end of paragraph [0019] of D66). This feature is directly and unambiguously disclosed in this sentence in a generic manner that is applicable to any bacteria for use in the composition of the invention. O5's allegations are thus unfounded.

### 5.2.4 Claim 8

113 O5 also alleges, without factual substantiation and incorrectly, that claim 8 relates to added subject matter, allegedly because the application does not disclose that a spore-forming fraction of a fecal sample may be "*obtained from a human*". This allegation is also incorrect. The application discloses that a relevant "*spore-forming fraction of a fecal sample obtained from a mammal*" (e.g., page 6, lines 24-26; paragraph [0008] of D66) achieves the effect upon regulatory T cells associated with the invention, and further that "*the "mammal" in the present invention*" may be a human (e.g., page 32, lines 2-4; paragraph [0021] of D66).

114 We note that, while the latter passage also lists other mammals, the focussing of this feature on humans does not generate any new information in the sense of a “selection”, because the skilled person considering the application as a whole in its technical context would derive unmistakable pointers indicating that the feature “*human*” is, of course, of particular interest.

115 For example, the application discloses clearly that “[t]*he composition of the present invention can be used for animals including humans*” (page 44, lines 1-2; paragraph [0039] of D66). It is also unambiguously clear to the skilled person considering the application as a whole in its technical context that the types of diseases to be treated (including autoimmune diseases and allergies) are such that their treatment is typically of interest in human patients. All such considerations together point directly and unambiguously toward the use of bacteria, and thus of a spore-forming fraction according to page 6, lines 24-26, obtained from <u>humans</u> in the claimed compositions, as disclosed on page 32, lines 2-4 of the application as filed.

116 The feature to which O5 has objected in claim 8 thus does not generate new information over the original disclosure.

### 5.2.5 Claim 9

117 O5 also alleges, again incorrectly and without substantiation, that claim 9 relates to added subject matter. However, page 6, lines 24-26 of the application as filed as already discussed above in connection with claim 8 provides the equivalent disclosure for a chloroform-treated fraction of a fecal sample obtained from a mammal.

118 Further, page 31, last paragraph (paragraph [0021] of D66) also states that such a sample achieves the effect underlying the invention:

> *“The active ingredient "chloroform-treated fraction of a fecal sample obtained from a mammal" in the composition of the present invention is not particularly limited, as long as the fraction is obtained by treating feces of a mammal with chloroform (for example, 3% chloroform), and has the effect of inducing proliferation or accumulation of regulatory T cells.”*

119 Thus, the observations provided above regarding claim 8 also apply to the basis for claim 9.

120 The skilled person would of course be aware from the technical context of the application as a whole that, in this context, this "*chloroform-treated fraction*" refers to a "*spore-forming fraction*" and thus to a "*chloroform-resistant fraction*" as mentioned in claim 8. See also the reference on page 81, lines 14-16, to "*fecal microorganisms (spore-forming fraction) resistant to 3% chloroform*", which, while found in an experimental example, is cited merely to illustrate that the skilled reader of would indeed have this understanding of these terms as being equivalent in the sense indicated above.

121 Thus, claim 9 also does not relate to any new information within the meaning of Article 100(c).

122 In conclusion, the subject matter of each claim has basis in the application as originally filed and in the second priority application. The objections of the Opponents in this regard are unfounded.

## 6 Novelty

### 6.1 D1 (Atarashi *et al.*, 2011) and D2 (Honda *et al.*, 2011) are not prior art

123 As the claims of the Patent are entitled to the second priority date of 3 December 2010, later-published documents D1 and D2 are not citeable at all as prior art, and are therefore not relevant to the novelty of the claims for that reason alone. The content of D1 and D2 therefore does not require further discussion in response to the oppositions.

### 6.2 Claim 1 is novel over D3 (US 5,599,795)

124 D3 was already discussed in detail during examination prior to grant, when it was filed by the representatives of O1 in third party observations. The Opponents have now once again cited this document. The subject matter of claim 1 is, however, novel over D3 for multiple reasons.

125 D3 is a US patent entitled "*Method for treatment of idiopathic inflammatory bowel disease (IIBD)*", and recites claims to methods of treating IIBD, Crohn's disease or ulcerative colitis, by administering to a patient a composition comprising at least one antibiotic agent and at least one anti-fungal agent and then infusing a bacterial

composition to the patient orally and rectally. Column 3, lines 1-7, and claim 3 list certain bacteria which, according to D3, are contemplated for this purpose.

### 6.2.1 D3 is not an enabling disclosure

126 D3 is not relevant to the novelty of claim 1 because D3 is not an enabling disclosure of any of the medical uses it proposes. The well-established legal standard for the enablement of disclosures under the EPC is the same for prior art under Article 54 as for patent applications and patents as such under Articles 83 / 100(b) (see, e.g., T 1437/07, point 25 of the reasons, also in the general area of medical uses: "*the requirements of sufficiency of disclosure are identical for a prior art document and a patent*"). For a disclosure of a medical use to be enabled, data on the level of clinical trials or even *in-vivo* experiments are not necessarily required, but on the other hand, a "*simple verbal statement*" of a particular medical use is not sufficient. At least some experimental data of a pharmacological nature are generally required in the disclosure to render the cause and effect underlying a proposed medical use credible (T 609/02, point 9 of the reasons; see, e.g., also T 801/06, point 28 of the reasons; also T 158/96, point 3.4.1 of the reasons; T 385/07, point 9 of the reasons; T 715/03; points 2.2-2.3 of the reasons; T 1859/08, points 6-14 of the reasons; cited in the Case Law of the Boards of Appeal, 8th ed. 2016, page 103).

127 D3 is clearly not an enabling disclosure of the proposed medical uses, because it is not based upon any experimental observations relating to at least a relevant mechanistic aspect of the diseases in question or the proposed treatment. In columns 3 and 4 of D3, a proposed medical treatment protocol is simply recited prophetically. No relevant in-vitro or animal experiments are provided, let alone is an outcome of the recited treatment protocol reported. Indeed, the method of treatment in D3 is not based upon any experimental observations at all. The entire disclosure in D3 is purely prophetic. The disclosure of D3 amounts to no more than a "*simple verbal statement*" within the meaning of, e.g., T 609/02, point 9 of the reasons.

128 O1 alleges that D3 is enabled "*in light of the long and well-known history of treating IBD with bacterial preparations*". That allegation, however, is not substantiated in any way. D3 is a prior art document which would have to be enabled as such, according to the established legal standards and as assessed on its publication date, in order to be potentially relevant for novelty.

129 A prior art disclosure is novelty destroying only if it, alone, discloses directly and unambiguously the subject-matter in question, taking into account only the skilled person's common general knowledge at the publication date of the cited document (e.g., T 410/99, point 3.2.1 of the reasons; Case Law of the Boards of Appeal, 8th ed. 2016, p. 102). It is not permissible to combine separate items of prior art together (see, e.g., the Case Law of the Boards of Appeal, 8th ed. 2016, p.104), and the relevant date for assessing the disclosure of a prior art document is the date of its publication (e.g., also T 205/91, point 4 of the reasons; T 305/94, point 2.8.3 of the reasons; T 737/00, point 1 of the reasons; Case Law of the Boards of Appeal *ibid.*, p. 70). Later information is not relevant.

130 D3 carries a publication date of Feb. 4, 1997, which is thus the relevant date for assessing its disclosure and enablement. The Opponents have provided no relevant evidence whatsoever establishing that the methods as disclosed in D3 were enabled to the standard required by the case law of the Boards of Appeal by that date.

131 In alleging that D3 was enabled, O1 relies on the disclosure of a second document, D4 (section 7.12 of their opposition). Nothing in D4, however, remedies the lack of enablement in D3. D4 has no bearing whatsoever upon the question of how the skilled person would understand and implement D3 for the purposes of assessing novelty.

132 D4 was published in December 1997, i.e., after D3, and in any case does not provide evidence of the skilled person's common general knowledge before the publication date of D3 (or indeed at any date). The purpose of D4 is not, for example, to provide an objective review of knowledge that was widely accepted in the field. To the contrary, D4 is merely a case report reflecting an individual author's own opinions and observations on a small number of patients. O1 refers to the introduction of D4, alleging without further substantiation that what it contains was "well-known". But, in fact, also in its introduction, D4 *prima facie* only reflects the individual views and personal citation preferences of its author. Nothing in D4 provides evidence of commonly held and accepted knowledge in the relevant technical field contributing in any way toward proof of enablement of D3.

133 To the contrary, the skilled person would have regarded the entirety of D4 as highly questionable, at any date. This applies to the nature, quality and significance both of the observations on patients reported in D4 as such and of the similar, alleged previous observations to which its introduction refers.

134 According to its own abstract and title, D4 is merely an "*open-label, uncontrolled study*", reporting treatment of only six IBD patients with bacterial preparations. The skilled person would immediately have noted from this that, due to the nature and very limited scale of the observations reported in D4, their informational value and significance was extremely limited. The term "*uncontrolled*" indicates that no patient group received a placebo control. The term "*open-label*" signifies that both the patients and the medical staff knew which treatment was being given in each case. The value attributed to the report by the skilled person would be yet further decreased by the fact that the treated patient group was extremely small.

135 Only two of the six patients (33%, patients "C" and "F") showed clinical remission after the treatment without relapse before the time of reporting. Further, considering the extremely small size of the patient group, the lack of any controls and the nature of the condition IBD, the skilled person would have been aware that such observations are not statistically significant and cannot, in principle, be distinguished from cases of spontaneous remission, which is well known to occur in IBD. See below, paragraphs 172-177, which refer to statistically significant and properly controlled data which are reported, e.g., in D76, showing that remission rates in placebo controls and in patients treated merely with antibiotics (as was also the case for all patients in D4) are entirely comparable or even higher than the alleged success rate in D4.

136 Thus, though D4 refers to itself as a "*trial*" or "*study*" (e.g., in the title and abstract), the skilled person would, objectively, rather have perceived D4 as a simple, entirely inconclusive <u>case report</u> on the treatment of a small number of individual patients by a method which was of unconfirmed and questionable therapeutic value and was incompletely described (see below).

137 The skilled person would also have noted that the introduction of D4, to which O1 has particularly referred, does not in effect provide any information of any further significance. The introduction refers in part to unpublished, entirely unverifiable and vague observations attributed to colleagues of the author (see e.g. D4, page 1002, first and second full paragraphs) and in part to other "*uncontrolled, open-label*" case reports on small groups of patients which are *prima facie* of a similarly inconclusive quality as D4 (page 1004, first and third full paragraphs). The skilled person would have attributed no greater significance to any information in the introduction than to the further content of D4 as such. Such inconclusive, questionable, minor case

reports are far removed from being commonly accepted knowledge. Overall, D4 falls far short of discharging burden of proof O1 carries when alleging common general knowledge, let alone of enabling the deficient disclosure of D3.

138 The skilled person would also have noted that the disclosure of D4 is itself incomplete and non-enabled in other ways, which are discussed in further detail separately below, because Opponents have also cited D4 itself as allegedly relevant for the novelty of the claims of the Patent. For example, D4 does not in fact disclose which bacteria were administered to any individual patient. Such aspects of D4 further underline that D4 would overall simply be perceived as questionable, even defective and non-enabling in multiple aspects, and that D4 is simply not relevant as a possible remedy of the non-enablement of D3 as alleged by O1. D4 cannot enable D3.

### 6.2.2 No disclosure of the relevant effect underlying the claimed medical use

139 In addition, while D3 (top of column 3, and of column 4) mentions a list of bacteria of which some belong to Clostridium clusters IV and XIVa, this does not amount to a disclosure of the functional subclass of bacteria of Clostridium clusters IV and XIVa which induces proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells, and of the functional, mechanistic feature that is thus required by the claim.

140 Firstly, this functional property is not an "inherent" feature of bacteria of either Clostridium clusters IV and XIVa in general, or the specific species of such bacteria mentioned in D3.

141 It is well-established by the case law of the Boards of Appeal that an alleged disclosure can only be considered "inherent" or "implicit" if it is immediately apparent to the skilled person that nothing else than the alleged implicit feature forms part of the subject matter disclosed (T 95/97, T 51/10; see also the Case Law of the Boards of Appeal, 8th ed. 2016, p. 105). The feature in question, although not mentioned, must be present inevitably, directly and unambiguously. The Opponents' allegations regarding the properties of the bacteria mentioned in D3 do not meet this legal standard for an "inherent" disclosure.

142 For example, D69 provides evidence that strain A2-165 of *Faecalibacterium prausnitzii* does not have this property. *F. prausnitzii* is listed in D3 by its older name *Fusobacterium prausnitzii*. The species belongs to Clostridium cluster IV. In D69, five

different strains of *F. prausnitzii* were tested. It was shown that each of these *F. prausnitzii* strains had different capacities to induce IL-10 and other cytokines (see D69, page 3, Fig. 1). Figure 8b on page 9 of D69 shows specifically that, *e.g.,* strain A2-165 of *F. prausnitzii* does not induce Foxp3-positive regulatory T cells.

143 Thus, it cannot be simply assumed that bacteria listed in D3 are disclosed as inevitably having the functional activity required by claim 1. To the contrary, the teaching of claim 1 regarding this therapeutically relevant functional activity is not disclosed in D3. Thus, the claimed subject matter is novel over D3.

144 We add immediately at this point that arguments by certain Opponents attempting to make a link between novelty and sufficiency of disclosure in this regard are unfounded and must fail. In contrast to the prior art, Example 7 and the results in Figures 13 and 14 of the present Patent, e.g., illustrate an approach by which the skilled person with common general knowledge in the relevant technical field following the teaching of the Patent can readily test bacteria for their ability to induce Foxp3-positive regulatory T cells without undue burden according to routine methods in the relevant field. That is, e.g., bacteria may be administered to GF mice and the ratio of Foxp3+ cells in CD4+ lymphocytes may be analysed by flow cytometry, as in the present Patent.

145 Secondly, we note that claim 1 is, in any case, further novel on the basis of the firmly established case law confirming the novelty of medical use claims based upon a new technical effect which was not previously made available in the prior art proposing or disclosing similar treatments (see G 2/88, Headnote 3; points 6.1 and 10 of the reasons and, e.g., T 290/86, point 6 of the reasons; T 836/01, points 10-11 of the reasons; T 1642/06, point 2.1 of the reasons; T 1859/08, points 6-14 of the reasons; T 1955/09, points 5-12 of the reasons; T 2506/12, point 2.6 of the reasons).

146 As Claim 1 is novel over D3 for multiple further reasons discussed above and below in this section, we will thus not expand in detail upon this legal principle in the context of D3. The relevant case law regarding this aspect of novelty is discussed in detail below in section 6.4, in the context of D5.

147 Briefly, however, claim 1 is a medical use claim in the format of Article 54(5) / 53(c) EPC, for which the achievement of the relevant treatment effect, including the expressly recited effect of inducing proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells in the treated individual, is a functional

technical feature of the claim. That effect is, moreover, described in the Patent as being associated with the types of bacteria that are recited in claim 1. The association, for the first time, of this pharmacologically highly relevant effect with defined types of colonic bacteria in the Patent creates an entirely new clinical situation for the treatment of diseases as claimed in which the induction of such Foxp3-positive regulatory T cells is beneficial.

148 In contrast, D3 is silent on this effect. Within the meaning of the above-cited case law, in D3 (and in the remaining prior art which has been cited against the present Patent), this technical effect, its association with bacteria specifically of Clostridium clusters IV and XIVa for the specific medical use as defined in claim 1, thus remained hidden, i.e., inaccessible to the skilled person. As is firmly established by the above-cited case law, in such circumstances, even if such an effect were "inherently" achieved by following the proposals of D3, the use as defined in claim 1 would still not be "made available" to the skilled person within the meaning of Article 54 EPC. The medical use according to claim 1 is thus also novel over D3 under this further aspect.

149 As mentioned, the relevant case law regarding this aspect of novelty is discussed in detail below in section 6.4, in the context of D5.

### 6.2.3 No disclosure of the relevant spore-forming subclass

150 Finally, although claim 1 is novel over D3 for the multiple reasons given above alone, we also note for completeness that, contrary to the Opponents' allegations, D3 also does not disclose the requirement of claim 1 that spore-forming bacteria of both Clostridium clusters IV and XIVa are to be used. D3 is silent on the spore-forming property of any bacteria. The mere listing of bacteria in D3 does not amount to a direct and unambiguous teaching to use spore-forming bacteria of both Clostridium clusters IV and XIVa as required by present claim 1. The property of forming spores is neither an "inherent" feature of bacteria of Clostridium clusters IV and XIVa in general, as the Opponents appear to wish to imply, nor of any relevant combination of cluster-IV and cluster-XIVa species mentioned in D3.

151 The legal standard for assuming that a functional property is "inherently" disclosed is strict. The feature in question, although not mentioned, must be present inevitably, directly and unambiguously.

152 Moreover, we recall that the relevant date for assessment of a prior art document from the perspective of the skilled person is its date of publication (see above, paragraph 129; T 205/91, point 4 of the reasons; T 305/94, point 2.8.3 of the reasons; T 737/00, point 1 of the reasons). The assessment must not be performed from the perspective in the field at any later date, e.g., not at the priority date of the Patent, and not at today's date. To support their allegations, Opponents rely upon documents D14, D15 and D9, which were published after D3, in 2014, 2013 and 2009, respectively. The Opponents have thus, in any event, provided no evidence whatsoever to support the position that the skilled person, reading D3 at the relevant date of its publication Feb. 4, 1997 would, directly, unambiguously and inevitably, have derived any teaching from D3 (either express or "inherent") to use spore-forming bacteria of Clostridium clusters IV and XIVa in combination as defined in claim 1.

153 Further, irrespective of the date on which the information became available, the evidence overall on the nature of any bacteria of Clostridium clusters IV and XIVa mentioned in D3 does not support the position that D3 inevitably discloses spore-forming bacteria of Clostridium clusters IV and XIVa in combination. On closer inspection, even the content of the later-published documents on which the Opponents rely does not in fact support the Opponents' standpoint on the properties of the species in question. To the contrary, as will be shown below, the available evidence overall shows that potentially relevant bacteria alleged by the Opponents to be spore-formers are in fact confirmed, sometimes by multiple independent sources, to be non-spore formers.

154 Of the bacteria listed in D3 (either at the top of column 3 in the description or in claim 3), only *F. prausnitzii* and *Ruminococcus bromii* belong to Clostridium cluster IV. Further, only *Eubacterium rectale, Ruminococcus gnavus*, and *Ruminococcus obeum* belong to Clostridium cluster XIVa. D70-D74 as filed herewith, which have previously been cited and discussed during the examination phase in response to the same type of allegations in third party observations, provide evidence that each of the bacteria of Clostridium clusters IV and XIVa in the prior art upon which the Opponents rely are non-spore formers. It cannot be assumed that the skilled person would inevitably have derived any other information from D3, either in 1997 or indeed at any later date. The Opponents have not convincingly rebutted the evidence provided by D70-D74. D14, D15 and D9 (in 2016, 2013 and 2009, respectively), upon which O1 relies, proposed alternative approaches to the assessment and definition of spore forming

properties only significantly later than the publication date D3, and moreover do not appear to provide conclusive evidence. These documents cannot retrospectively change the disclosure the relevant skilled person would have derived directly and unambiguously from D3 as assessed at its legally relevant publication date of February 4, 1997.

155 Moreover, on closer inspection, even by the criteria proposed in D14, the data on which O1 relies in any case do not even support the position that relevant bacteria of both Clostridium clusters IV and XIVa as mentioned in D3 are spore formers. We file herewith Supplementary Table 1 of D14, as D75. O1 failed to include this information when filing D14. This table, however, is part of the disclosure of D14, because it was published with D14 and shows details of the data on which the overall message in D14 is based. For a large number of individual bacteria, the table shows the two criteria by which the authors of D14 proposed to judge whether bacteria were spore-formers, in columns entitled "*etoh resistant*" and "*spore signature score*". According to D14, resistance to ethanol and a "*spore signature score*" of greater than 0.5 indicate spore formers. For example, by these two criteria of D14, *F. prausnitzii* is thus clearly not a spore former. The relevant entries 78, 79 and 81 in the column "*order on tree*" in D14, Supplementary Table 1 for *F. prausnitzii* indicate that *F. prausnitzii* is fact "*ethanol sensitive*", i.e., a non-spore former. Additionally, the "*spore signature score*" is below 0.5 (at 0.138, 0.462 and 0.462, respectively), again indicating a non-spore former. Similar assessments apply to other bacteria upon which O1 relies.

156 This aspect may be discussed further if necessary in the course of the proceedings; however, as mentioned above, for the sake of procedural economy we will not expand upon this point here, because the claims are also novel over D3 and other citations for multiple other reasons.

### 6.3 Claim 1 is novel over D4 (Abrams)

157 Some Opponents have also cited D4 under the aspect of novelty. As already mentioned above, D4 is a case report according to which six IBD patients were given bacterial preparations. The subject matter of the present claims is also novel over D4, for the following reasons.

### 6.3.1 Lack of disclosure for bacterial preparations

158 D4 lacks both relevant (1) disclosure and (2) enablement, initially, because D4 does not provide any clearly and unambiguously defined disclosure of the composition of the bacterial preparations which were actually administered to patients in any concrete embodiment of a treatment. D4 does not disclose which bacteria were administered to which patient.

159 The abstract of D4 refers to repopulation of patients by "*12 strains of colonic bacteria*".

160 On page 1003 D4 states

> *"The replacement bacteria consisted of 12 specific strains of anaerobes and 1 strain of E. coli"*
>
> (page 1003, first paragraph, lines 6-7).

This refers to 13 colonic "*strains*" in total, which is in contradiction to the abstract.

161 D4 then, however, in the same paragraph at lines 10-15 goes on to list 22 different individual "*species*" of bacteria as being "*included*", in some undefined manner, amongst the "*specific strains*" of "*replacement bacteria*". That is a further evident contradiction, in various respects. Neither the 12 strains according the abstract nor the 13 "*specific strains*" of bacteria of which the "*replacement bacteria consisted*" for administration to patients according to the beginning of the same paragraph can be derived from this disclosure.

162 Firstly, a greater number of 22 "*species*" cannot be "*included*" in a smaller number of 12 or 13 "*specific strains*". The skilled reader of D4 can only speculate about whether some undefined selection of 12 or 13 strains "*replacement bacteria*" from amongst the larger group of 22 species was in fact administered, and whether different selections might have been administered to different patients. In any case, D4 provides no direct and unambiguous disclosure of any concrete set of "*replacement bacteria*" for administration, let alone which combinations of "*replacement bacteria*" were administered to which patient.

163 We also note that, out of the 22 species of bacteria listed on page 1003, lines 10-15, only two (*F. prausnitzii* and *Ruminococcus bromii*) belong to Clostridium cluster IV.

When selecting 12 or 13 strains from these 22 species, the statistical likelihood of even a single strain of Clostridium cluster IV being included is very low. Also, only four strains of the listed bacteria belong to Clostridium cluster XIVa (*Eubacterium rectale, Ruminococcus gnavus*, *Ruminococcus obeum* and *Coprococcus eutactus*). Statistically, many selections made from this list of 22 species would not include strains of either Clostridium cluster IV or XIVa. Moreover, the vague statement on page 1003, lines 6-7, does not specify that each of 12 "*specific strains*" is to be selected from a different bacterial species (or genus). Thus, the disclosure of page 1003, first paragraph, encompasses selections of multiple strains from the same species. This yet further underlines that the disclosure of page 1003, first paragraph, does not directly and unambiguously relate to combinations of bacteria of both Clostridium clusters IV or XIVa, as required by claim 1.

164 Secondly, the list of 22 species of page 1003, lines 10-15, does not include *E. coli*, which as noted above is said to be administered according to page 1003, first paragraph, lines 6-7. This confirms that this list of 22 species of page 1003, lines 10-15 *prima facie* cannot be a disclosure of a complete list of the species of replacement bacteria that were actually administered overall according to page 1003, lines 6-7.

165 Due to this and the wording "*included*" at line 10, the only information the skilled person would derive from the combined disclosure on page 1003 is that, for the "*replacement bacteria*" that were actually administered, 13 strains were selected from larger a group of species which included the 22 listed species but also an undefined number of others. Ultimately, D4 therefore does not allow any conclusion at all to be drawn regarding the actual composition of any specific embodiment of "*replacement bacteria*" for administration.

166 Thirdly, page 1003, lines 6-7, e.g., moreover refers to strains, whereas lines 10-15 refer only to species. Also for this reason, D4 lacks disclosure and enablement. Even if, e.g., 13 "*specific strains*" are selected, at least in part, from the 22 listed species (and apparently also from others that may not be mentioned in D4 at all), the "*replacement bacteria*" that were actually administered to patients, ultimately remain undisclosed.

167 In the "*protocol*" described from the middle of page 1003, D4 in the sentence bridging pages 1003 and 1004 merely refers to "*the 12 therapeutic anaerobes*", and "*E. coli*" without defining any "*specific strain*". Thus, the "*specific strains*" of "*replacement bacteria*" that were allegedly actually employed according to page

1003, lines 6-7, once again remain completely undefined. No further information on which patient received which composition of bacterial preparation is provided when the remainder of D4 goes on to describe the procedures applied to the individual six patients and the alleged results.

168 For all the reasons given above, regarding the identity of the bacteria administered to patients, D4 therefore lacks both relevant disclosure in regard of the present claims and enablement. D4 does not allow any direct and unambiguous conclusion at all to be drawn on the actual composition of the "*replacement bacteria*" for administration, and therefore does not disclose any potentially relevant embodiment of a combination of bacteria of Clostridium clusters IV and XIVa (and moreover having the further features required by claim 1). Moreover, any medical use proposed in D4 therefore also clearly lacks enablement already because the skilled person would not know which set of bacterial strains to administer in order to reproduce the treatment procedure and thus any results of D4.

169 In technical, scientific terms, for a medical case report purporting to communicate a particular treatment of patients, D4 is a significantly incomplete and non-enabling disclosure for this reason alone.

### 6.3.2 Lack of enablement for failure to render medical use credible

170 Moreover, as already indicated above, also for other reasons, D4 does not enable any proposed medical use to the legal standard that applies under the EPC (see above, paragraph 126). D4 does not provide at least a technical explanation supported by data rendering the cause and effect underlying a proposed medical use credible in mechanistic terms (T 609/02, point 9 of the reasons; see, e.g., also T 0801/06, point 28 of the reasons). Nor does D4 conclusively show, in terms of a study that would be credible to the skilled person in the relevant field (i.e., which would be controlled, "closed-label"/"double-blind", and would involve a sufficiently large patient group), that any statistically significant therapeutic effect has actually been achieved by the (undefined) bacterial preparations to which it vaguely refers (cf., e.g., T 385/07, point 9 of the reasons).

171 According to its own abstract and title, D4 is merely an "*open-label, uncontrolled study*", reporting treatment of only six IBD patients with bacterial preparations. The skilled person would immediately have noted from this that, due to the nature and very limited scale of the observations reported in D4, their informational value and significance was extremely limited. The term "*uncontrolled*" indicates that no patient

group received any type of control. This significantly decreases the value of any effect observed, especially for conditions such as IBD, were spontaneous remission is also known to occur. The term "*open-label*" signifies that both the patients and the medical staff knew which treatment was being given in each case. This introduces significant patient and observer bias. The value attributed to the report by the skilled person would be yet further decreased by the fact that the treated patient group was extremely small.

172 D4 itself acknowledges and draws attention this weakness:

> *"The strength of this study was also limited because it was not masked. In addition, no attempt was made to study a controlled series of IBD patients who would be treated with antibiotics alone, without bacterial replacement therapy"* [page 1010, beginning of third complete paragraph].

173 It is apparent from pages 1006-1009 of D4 that in fact only two patients ("C" and "F") out of the six patients treated (33%) appeared to undergo clinical remission after the treatment, at least until the time of reporting (D4, pages 1008 and 1009). In the remaining patients the treatment was not successful. Moreover, considering the extremely small size of this patient group, the lack of essential controls, and also the nature of the condition IBD, the skilled person would have been aware that even the two alleged treatment successes are not statistically significant or scientifically meaningful. D4 therefore does not even credibly show that any therapeutic effect has been achieved by the undisclosed bacterial preparations D4 so cryptically and ambiguously refers to.

174 Indeed, the two cases (i.e. 33%) in which "remission" was reported in D4 cannot, in principle, be distinguished from cases of spontaneous improvement, which commonly occurs in IBD, or simply improvements due to the antibiotics which were given to all patients (see D4, page 1003, penultimate full paragraph).

175 This is evident from a comparison, e.g., with relevant aspects of the clinical data that are discussed in D76. D76 discusses clinical studies in which patients with Crohn's disease (CD), which is one type of IBD that is also tested in D4, were treated with antibiotics. In contrast to D4, the studies discussed in D76 included the usual controls and involved significantly larger patient groups (see D76, page 1080, last two paragraphs, discussing "*11 randomised, double blind studies involving a total of*

*823 patients*”), and were thus much more appropriately designed to reveal statistically and scientifically meaningful results.

176 As mentioned in the first paragraph of page 1081 of D76, by this assessment, clinical improvements were observed in 37.9% (153/403) of CD patients even in the placebo group, i.e., patients receiving no treatment at all. In the group of CD patients receiving broad-spectrum antibiotics, as did all six patients in D4, clinical improvement occurred in 56.1% (214/429) of patients. This underlines that, in D4, at an allegedly observed remission rate of 33% (2/6 patients) in patients receiving antibiotics, there is simply no basis for attributing any treatment effect to the administered bacteria.

177 Thus, D4 does not credibly disclose any meaningful treatment success. The alleged success rates are at best comparable to – and in fact worse than – the rates for placebo or antibiotic-treated patients in similar studies. This is quite aside from the fact that the D4 patient group is of a statistically insignificant size and completely devoid of controls.

178 D4 itself both appears to acknowledge the common occurrence of spontaneous remission and admits that its own measurement of clinical remission “*may be inaccurate*” for the yet further reason that the author of D4 did not test for objective measures of remission such as cytokine profiles and histologic appearance:

> “*Clinical remissions, some lasting for many years, are commonly reported in cases of IBD. However, measurement of clinical remission may be inaccurate, because remissions are usually determined by disease activity indices that are based mostly on clinical observations and patients’ subjective evaluations. Histologic activity may continue at a subclinical level. There is a paucity of data in the literature regarding the use of more objective measures of remission, such as cytokine profiles and histologic appearance, to determine the extent and completeness of remissions. None of these measures were tested in this study* [paragraph bridging pages 1010 and 1011].

179 For all the reasons above, the skilled person would not be able to draw a conclusion as to whether any therapeutic effect was in fact achieved by the type of treatment proposed in D4.

180 It is well established by the case law of the Boards of Appeal in the area of medical use claims that a prior art citation is not prejudicial to the novelty of a claim if the citation does not allow any conclusion to be drawn with regard to the actual existence either of a pharmacological effect making the proposed medical use credible (in terms of a cause-and-effect relationship within the meaning of T 609/02, see above – as in the Patent) or directly of a therapeutic effect (see also T 158/96; T 385/07; T 715/03; points 2.2-2.3 of the reasons; T 1859/08, points 6-14 of the reasons; cited in the Case Law of the Boards of Appeal, 8th ed. 2016, page 103).

181 As stated, e.g., by the Board of Appeal in T 385/07 (point 9 of the reasons), fully in keeping with the previous case law (citing T 158/96, point 3.4.1 of the reasons), with regard to the enablement of descriptions of "*clinical phase evaluation*" in the prior art –

> *"… information in a citation that a medicament was undergoing a clinical phase evaluation for a specific therapeutic application was not prejudicial to the novelty of a claim directed to the same therapeutic application of the same medicament if the content of said citation did not allow any conclusion to be drawn with regard to the actual existence of a therapeutic effect or any pharmacological effect which directly and unambiguously underlay the claimed therapeutic application".*

182 Overall, in conclusion so far, D4 is thus a severely incomplete and indeed defective disclosure of the medical use it proposes, lacking enablement in multiple respects. By the applicable legal standard for enablement, D4 would therefore not be relevant to the novelty of the present claims even if D4 disclosed relevant bacteria – which is also not the case.

### 6.3.3 No disclosure of the relevant effect underlying the claimed medical use

183 Further, as explained in section 6.2.2 above in the context of D3, a mere listing of the bacterial species of Clostridium clusters IV and XIVa as in D4, page 1003, lines 10-15 does not amount to a disclosure of the functional subclass of bacteria of Clostridium clusters IV and XIVa which induces proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells in the treated individual, and of the functional, mechanistic feature that is thus required by the claim.

184 In particular, the example of strain A2-165 of *F. prausnitzii*, a bacterium belonging to Clostridium cluster IV, which, as shown by D69, does not have this feature,

demonstrates that it cannot simply be assumed that this functional activity is an "inherent" feature of the relevant species of Clostridium clusters IV and XIVa.

185 Further, even if, for the sake of argument, any selection of potentially relevant bacterial species according to D4, page 1003, lines 10-15 were assumed "inherently" to have this effect, we recall that D4 does not disclose any such selection. As explained above, D4 contains no clear disclosure of any embodiment defining a concrete selection of bacteria actually used to treat a patient at all, and moreover fundamentally lacks enablement for this and other reasons also explained above.

186 Further, purely for the sake of argument, even if the relevant technical effect of inducing proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells in the treated individual were "inherently" achieved by following any disclosure in D4 (which is not the case for the multiple reasons already discussed above and further herein below), claim 1 would still be novel over D4 by the legal principles which have been well established by the case law of the Boards of Appeal in the area of medical use claims based upon a new technical effect which gives rise to a new specific medical use.

187 As already discussed briefly in the context of D3, claim 1 includes the attainment of the recited effect upon Foxp3-positive regulatory T cells as a functional technical feature of the claim. In D4, just as in D3, even if this effect could be assumed to be "inherent" in any aspect of D4, the effect in any case remained hidden. The specific new medical use as presently claimed was thus not made available as such to the public and is thus novel within the meaning of Article 54 EPC by the well-established principles of the case law for such cases (see G 2/88, Headnote 3; points 6.1 and 10 of the reasons and, e.g., T 290/86, point 6 of the reasons; T 836/01, points 10-11 of the reasons; T 1642/06, point 2.1 of the reasons; T 1859/08, points 6-14 of the reasons; T 1955/09, points 5-12 of the reasons; T 2506/12, point 2.6 of the reasons). The case law regarding this aspect of novelty is discussed in further detail below in section 6.4, in the context of D5.

188 In conclusion, the subject matter of claim 1 is thus also novel over D4 because D4 does not disclose the relevant technical effect and the associated specific new use based upon that effect, as presently claimed.

### 6.3.4 No disclosure of the relevant spore-forming subclass

189 Finally, although claim 1 is novel over D4 for the multiple reasons given above alone, we once again note for completeness that, D4, just as D3, is also silent on whether bacterial species contemplated for use (D4 page 1003, lines 10-15) should have spore-forming properties. Thus, for the reasons already outlined in the context of D3 (section 6.2.3 above), D4 does not amount to a disclosure of relevant bacteria as "inherently" spore-forming as alleged by the Opponents. Claim 1 is thus additionally novel over D4, because D4 does not provide a direct and unambiguous disclosure of a use of spore-forming bacteria of both Clostridium clusters IV and XIVa in combination as is required by the present claims.

### 6.4 Claim 1 is novel over D5 (Bakken)

190 Some Opponents take the position that claim 1 lacks novelty over D5, allegedly due to an "inherent" disclosure of the effect on Foxp3-positive regulatory T cells as recited in claim 1. That position is incorrect.

191 Claim 1 is, however, a specific medical use claim which is, in any case, novel over D5 at least by the principles of the case law on the novelty of medical use claims based upon a new technical effect (G 2/88, Headnote 3; points 6.1 and 10 of the reasons and, e.g., T 290/86, point 6 of the reasons; T 836/01, points 10-11 of the reasons; G 2/08, point 6.3 of the reasons; T 1642/06, point 2.1 of the reasons; T 1859/08, points 6-14 of the reasons; T 1955/09, points 5-12 of the reasons; T 2506/12, point 2.6 of the reasons). According to these well-established legal principles, novelty is acknowledged for medical use claims which are based upon a new technical effect so as to give rise to a new use within the meaning of G 2/88 and G 2/08 and thus to a new clinical situation, even if the relevant effect may have been achieved "inherently" in the prior art.

### 6.4.1 Limited technical quality and significance of D5

192 D5 relates to crude transfers of stool from healthy individuals to patients suffering from recurrent *Clostridium difficile* infection. This approach is referred to in D5 as "*fecal bacteriotherapy*" and may elsewhere be referred to as "*fecal microbiota transplantation*" or "*FMT*".

193 D5 provides a general description and discussion of the approach, though it is also to be noted from the outset that D5 does not provide any credible, controlled primary

patient data of its own, and rather cites only other patient reports (see Table 1). It should therefore also be noted that D5 does not report that the primary literature cited, e.g., in Table 1, has been subjected to any assessment, based upon objective criteria, for quality and credibility. Such criteria would include completeness of disclosure, appropriate controls for comparison and to exclude patient and observer bias, and the inclusion of sufficiently large patient and control groups to achieve statistical significance. Thus, the author of D5 does not appear to have checked the cited primary literature for at least the most serious deficiencies as are apparent, e.g., in D4. The author of D5 does not appear to be have been selective or critical regarding which literature was taken into account.

194 Nevertheless, based upon its author's impression gained from "*published cases*" (D5, Table 1), D5 assumes that the administration of crude stool samples leads to good success rates, at least against recurrent *Clostridium difficile* infections.

### 6.4.2 Novelty based upon a new technical effect

195 Even if this conclusion were to be taken at face value, the specific medical use as defined in claim 1 is novel over a disclosure such as D5. Stool samples of the type described in D5 may, of course, be expected "inherently" to contain bacteria of Clostridium clusters IV and XIVa – amongst a large variety of bacteria that do not belong to this group. But D5 is entirely silent on the technical effect of inducing accumulation of proliferation of Foxp3-positive regulatory T cells and its association specifically with bacteria of Clostridium clusters IV and XIVa, upon which the specific use of claim 1 is based. Even if this effect was, to some extent, also attained "inherently", "silently" or "secretly" in FMT therapies as described in D5, the specific use as presently claimed is novel, because in D5 this effect, and any use based specifically thereon, remained entirely "hidden" and "inaccessible" to the public within the meaning of the established case law on such factual constellations which is cited above and will be discussed in further detail below.

196 Further, for the avoidance of doubt, the association of this effect specifically with bacteria of Clostridium clusters IV and XIVa indeed creates a new clinical situation compared to the state of the art of FMT, within the meaning the applicable case law. D5 is concerned with a type of therapy which, in multiple, clinically significant aspects, is distinct from the novel therapeutic approaches made possible only by the present invention as defined in claim 1. The use as presently claimed also represents a significant advance over any disclosure in D5. Compared to the crude stool

transfers and their effects as disclosed in D5, the present invention opens the door to therapies which can be much more specific, precisely targeted and improved in numerous aspects, including: –

- the patient group to be treated,
- the nature and composition of materials administered, with further clinically significant consequences for: –
- hygiene and patient safety from pathogens,
- forms and modes of administration,
- therapeutic efficacy,
- risks and inconvenience for both patients and caregivers,
- aesthetic concerns,
- acceptance by patients and caregivers in practice,
- clinical technical and administrative efforts, and, not least,
- costs for all concerned.

197 The Opponents allege that the type of FMT described in D5 would "inherently" achieve the effect of inducing accumulation of proliferation of Foxp3-positive regulatory T cells as is required in claim 1. O1 alleges this essentially without any substantiation, referring for comparison only to <u>chloroform extracts</u> as mentioned in the present Patent (which are, however, in fact evidently rather different compositions from the stool samples for FMT as described as in D5). O3 relies upon post-published documents D32 and D33 which, however, report studies on FMT with diseases other than *C. difficile* (D32 concerns mouse models of steatohepatitis and D33 humans with acute graft-versus-host disease), i.e. test subjects of a very different nature and in very different conditions compared to D5.

198 O1 also alleges, again without further explanation or substantiation, that the association of the technical effect upon regulatory T-cells in a treated individual specifically with bacteria of Clostridium clusters IV and XIVa as claimed does not give rise to a new clinical situation compared to the FMT of D5 within the meaning of

T 836/01 (cited, again, without further explanation). O3 simply cites D5 without even attempting to engage with the legally relevant criteria at all.

199 Under precisely the case law to which O1 has alluded, however, these allegations and submissions on no account lead to a conclusion of lack of novelty in the present case.

### 6.4.3 The clinical situation according to D5

200 D5 discloses that "*fecal bacteriotherapy*" was intended to be based, in essence, on an effect termed "*colonisation resistance*". According to D5 in the paragraph bridging pages 285 and 286, "*colonisation resistance*" refers to direct antagonism of and competition with, exogenous pathogens, such as by "*production of antimicrobial factors*", "*competing for available binding sites in the epithelial lining of the colon*", and "*being able to utilise available nutrients and food sources more efficiently than the competition*". See also page 288, last paragraph, which states that –

> *"Most researchers agree that the fundamental problem with RCDI results from the absence of healthy bacteria in the colon to keep growth of C. difficile suppressed … However, the relative roles played and the identities of individual bacterial species (especially Bacterioides and Prevotella) that effectively maintain colonization resistance are currently unknown. Future identification of specific key bacteria that are most important for upholding balance in the colon may permit the development of commercial, storable "synthetic stool" products that will resolve many of the practical and perceived aesthetic problems that are associated with faecal bacteria therapy today"* [emphasis added].

201 D5 also referred particularly to a reduction in "*phylotype richness*" in patients with *C. difficile*, and suggested that it was the "*restoration of microbial diversity*", by which a transfer of whole stool samples from healthy individuals would be effective (see the first full paragraph on page 286). Thus, according to D5, the use of whole stool samples was of interest due to the large number of different types of microbes (at least in part unknown) contained in whole stool. At least some unidentified microbes contained therein, or possibly simply the entire "*diversity*" of bacteria as such, were, according to the information derivable from D5, believed and intended simply to counteract and compete with *C. difficile* directly.

202 On the other hand, D5 is totally silent on the specific, and indirect, immunological effect upon Fox3p-positive regulatory T cells by bacteria of Clostridium clusters IV and XIVa as recited in claim 1. While the direct, competition-based treatment effects according to D5 mentioned above might of course be useful in their own right to treat some patients, none of them involve this effect upon Fox3p-positive regulatory T cells. This indirect, immunological effect upon Fox3p-positive regulatory T cells is, for the first time, described in the present Patent as being associated with these types of bacteria, with detailed experimental support in the Examples.

203 Compared to D5, this effect identifies a new clinical situation within the meaning of the applicable case law in various respects.

204 Firstly, it identifies a situation in which it could be preferable specifically to treat patients by the indirect and immunological effect of increasing proliferation or accumulation of Foxp3-positive regulatory T cells, rather than to act by any other therapeutic approach not involving this specific immunological aspect, such as the direct and competition-based "*colonisation resistance*" effect of D5. This aspect corresponds entirely to the cases in which new clinical situations based upon new effects have been acknowledged in the case law even when other effects were previously achieved by otherwise similar or even identical treatments (T 836/01, points 10-11 of the reasons; T 1642/06, point 2.1 of the reasons; T 1955/09, points 5-12 of the reasons).

205 As pointed out by the Board of Appeal in T 836/01 (point 10 of the reasons), since a new clinical frame is not separable, as an abstract concept, from a patient suffering under it, this new clinical situation also identifies a new sub-group of subjects being treated.

206 Moreover, D5 makes clear that the fecal bacteriotherapy (FMT) with which it is concerned is a significantly risky, complex, tedious, inconvenient, lengthy, unpleasant and costly procedure from the perspective of both patients and caregivers. In cases in which the indirect and immunological effect on Foxp3-positive regulatory T cells according to the present invention is appropriate and desirable, the attribution of this effect to specific types of bacteria as recited in claim 1 also allows all such disadvantages of FMT to be overcome. The claimed specific use thus also gives rise to a completely different and novel clinical situation in such respects.

207 D5 describes "*fecal bacteriotherapy*" as "*the process of instilling a liquid suspension of stool from a healthy donor into the gastrointestinal tract*" (page 286, column 1, the first sentence under the subtitle "*Fecal bacteriotherapy*").

208 D5 makes clear that such stool transplants involve a significant health risk for patients first and foremost due to the possibility of donor stool being infected by dangerous contagious pathogens such as hepatitis A, B and C, HIV, syphilis, *C. difficile* (which may be symptom-free and thus concealed in some individuals), enteric bacterial pathogens, ova and parasites such as *Giardia* and *Cryptosporidium* (see D5, paragraphs "b" and "c" bridging pages 286-287; Table 2, page 288, column 1, paragraph 2). Thus, donors must be selected carefully and both their blood and their stool carefully screened in multiple ways for a prolonged, "*30-day period preceding the actual stool installation procedure*" (page 287, column 1, lines 1-4), whereafter evidently a risk will always remain that a pathogen or parasite has remained unnoticed, with potentially devastating consequences for the patient to be treated whose health is already severely compromised.

209 The actual administration procedure is described in the passage bridging columns 1 and 2 of page 287 of D5. The procedure in practice involves infusion of the third party's fecal matter typically either through a "*nasoduodenal*" or "*nasojejunal*" tube, i.e., tubes which are inserted through the patient's nose into their upper GI tract, their stomach and further into their small intestine, or by an infusion through the patient's rectum in the form of an enema.

210 Evidently, it is for most people inherently at least "aesthetically" unappealing to be administered a third party's faeces by whichever route. The procedure through the nose, however, evidently specifically involves significant discomfort and risks. D5 mentions "*perforation of the upper GI tract by the NG* [nasogastric] *tube, and potential aspiration of fecal material*" as risks of this approach. Although rectal transfer is the procedure most typically used (76% of the cases considered in D5 according to the cited passage of D5), this latter procedure is yet further "*inherently associated with <u>increased risk of complications (colon perforation</u>)*".

211 Especially for the typical rectal transfer procedure, significant volumes of prepared stool slurry from the donor are required (see D5, page 287, column 2, paragraph 1 and Table 3), and this procedure is also associated with "*significant spillage of stool leaking backwards through the rectum after installation*". As D5 further points out, somewhat euphemistically: "*Typically, there is a significant back leakage of fecal*

*material around the enema catheter which creates a bit of a mess and may be unappealing to the patient*". D5 also points out that, accordingly, also caregivers "*perceive fecal therapy negatively*" at least "*due to the lack of aesthetic appeal*" (D5, page 288, lines 3-4). Moreover, this procedure typically needs to be endured repeatedly by all concerned throughout "*multiple instillations distributed over multiple days*", i.e., typically "*repeated installations … over a period of 3-5 days*" (Page 287, column 2, lines 9-10; page 288, column 1, paragraph 1, last 6 lines).

212 After the lengthy initial procedure to select and health screen each donor, for the actual stool transfer procedure, a significant scheduling and coordination effort is required between the donor, the patient, and multiple departments of a hospital, i.e., "*the operator of the installation procedure, the clinical laboratory (typically the microbiology laboratory) and the radiology department*" (D5, column 1, end of second full paragraph). Initially "*the timing of the stool collection should be as close to the installation procedure as possible*", but due to the high volumes required for the typical, rectal approach may need to "*begin 24 hours before the planned procedure*" (D5, page 287, penultimate paragraph "*c.*" and Table 3). Then, the stool slurry must be prepared as described in the penultimate paragraph of D5, page 287, ideally for immediate use (or frozen in aliquots). The actual administration of this faecal matter to the patient and then also involves simultaneous X-ray radiography, to verify that the tip of the infusion catheter is in the correct position (see D5, page 287, column 1, paragraph 3, last 2 lines, and page 288, column 1, paragraph 1, line 8).

213 As D5 points out, the complexity and duration of these procedures incurs a significant cost, both in terms of the medical services provided and in terms of loss of patient work productivity (e.g., considering slow and repeated instillation of donor faeces slurry to the rectum over a period of 3-5 days; see page 288, column 1, paragraph 1, last 6 lines).

214 According to the FMT approach described in D5, it is important to note that all of these drawbacks occur, and indeed apparently need to be accepted in order to have any hope of therapeutic success, because it was necessary to use slurry from <u>whole stool</u>. That in turn was necessary because, the only information available regarding therapeutic cause and effect according to the state of the art such as in D5 before the present invention was a vague notion that <u>something</u> in the normal bacteria contained in the colon and faeces led to a therapeutic benefit in *C. difficile* patients, apparently through restoration of the effect of "*colonisation resistance*", i.e., direct

antagonism against or competition with the pathogenic bacteria. According to page 286, column 1, first full paragraph, the "something" in faeces leading to those effects was possibly also simply the sheer number and diversity of different microbial species contained in normal faeces.

215 The clinical situation surrounding the "*fecal bacteriotherapy*" according to, *e.g.*, D5 was thus clearly rather extraordinary. Overall, that approach was a rather unscientific enterprise, and was moreover associated with very significant clinical drawbacks. This was a clinically entirely undesirable situation. Changes and improvement to that situation through more specific scientific insights and technical progress were clearly highly desirable.

### 6.4.4 New clinical situation by virtue of the present invention

216 By making a connection, for the first time, between specific types of bacteria and a specific effect upon patients' immune systems, the present invention gives rise to a new clinical situation, also because, for patients in whom such an effect is desired, the invention allows practitioners to move away from and improve upon the crude and unsafe use of whole human faeces as in D5. They can do so, in the newly defined therapeutic area, for the first time in a way that is guided by concrete scientific results, in terms of both the active bacterial ingredients for the composition and knowledge of the pharmacological effects to be expected in certain patients which would underlie any intended treatment benefit.

217 Thus, specifically, the present invention also gives rise to a new clinical situation because – at least for patients in whom the relevant new effect is intended – it obviates the need for whole stool and the associated risks, complications, inconvenience, efforts and costs that are evident from D5. By associating the immunological effect upon Foxp3-positive regulatory T-cells with specific types of bacteria, the claimed invention opens the door to the controllable, reproducible and hygienic preparation of safe and convenient compositions containing only such specific, desired bacteria grown from laboratory cultures, for use in the group of patients in which this immunological effect is desirable.

218 Significantly, such compositions for this specific use according to the invention eliminate the risk of contamination by undetected contagious pathogens or parasites, which can never be wholly excluded in the case of any preparation originating from stool samples of a donor as in D5.

219 The highly undesirable large volumes of fecal material that need to be handled and forced into a patient according to the approach of D5 can be avoided, because a composition for use according to the claimed invention need contain only desired, specific bacteria.

220 Compositions for this specific, claimed use can thus be made in forms which can administered without any further health risks, inconvenience and – comparatively speaking – without any occasion for aesthetic repulsion whatsoever. For example, suitable types of small, clean capsules containing only selected bacteria, e.g., in lyophilised, dry form can be used, which can simply be swallowed by patients just as any other capsule.

221 This stands in stark contrast to the discomfort and risks for patients of having, e.g., tubes with third-party faeces inserted through the nose or the rectum into the intestine, being instilled with large volumes of such faeces repeatedly and for extended periods of over up to 5 days, often aggravated by unpleasant complications such as regurgitation and other unintended leakages of faeces, not to speak of the risks of internal perforation by catheters and/or faeces entering unintended body cavities such as the lungs or the parenteral space.

222 Evidently, the need for complicated planning and coordination for extended time periods between donors, patients and multiple hospital departments is also eliminated in the new situation made possible by the present invention.

223 Needless to say, the immunological effect according to the claims can also be stronger than with crude whole-faeces slurry, because the relevant bacteria are not necessarily diluted by countless other bacteria.

224 Clearly, overall, for the relevant patient group treated by the immunological effect, the clinical situation associated with the new specific use as claimed could not be more different from the crude approach of transferring slurry from whole faeces as discussed in D5.

225 D5 itself essentially expressly acknowledged that an invention of the present type was missing in 2009, in order to advance the field and create a truly new clinical situation. In its concluding paragraph, D5 expressly acknowledges the shortcomings of the clinical situation it describes and points out in general terms the distinct type of clinical situation which would be a desirable to change that, namely the

identification of which bacteria in the fecal slurries "*key*" and "*most important*". That is, essentially, the identification of which bacteria have particular effects, which is exactly what the present invention provides:

> *"the relative* *roles played* *and the* *identities* *of individual bacterial species (especially* Bacterioides *and* Prevotella*) that effectively maintain* *colonisation resistance* *are currently unknown. Future* *identification of specific key bacteria* *that are most important* *for upholding balance* *in the colon may permit the development of commercial, storable "synthetic stool"* *products that will resolve many of the practical and perceived esthetic problems* *that are associated with faecal bacteria therapy today."*

226 Of course, D5 here still focuses on "*colonization resistance*" as the assumed relevant effect, which is the only effect mentioned in D5.

### 6.4.5 The applicable case law

227 Under the established case law, the observations above unequivocally lead to the conclusion that the specific new use of claim 1 is novel over D5. O1 has referred to one relevant decision, T 816/01, in connection with D5, alleging without any further substantiation whatsoever that the present invention does not give rise to a new clinical situation compared to D5 within the meaning of that case law. It will be clear from the above, if the actual content of D5 and the key features and practical clinical significance of the present invention are considered and compared, that this allegation by O1 is void of substance and entirely inconsistent with the circumstances of the present case. As the Opponents either misapply or completely ignore the relevant legal principles, the applicable, well-established case law supporting the novelty of present claim 1 will also be discussed. As will be seen, the Opponents' position on novelty is wholly incorrect.

228 As already indicated above, the starting point for applying the relevant case law to the present case is the consideration that claim 1 is a specific medical use claim in the format of Article 54(5) / 53(c) EPC, for which the achievement of the relevant effect is a functional technical feature of the claim.

229 The bacterial composition is not claimed merely for use in the treatment of infectious disease, autoimmune disease or allergic disease in general. Claim 1 more specifically requires a use in the treatment of these diseases specifically in a manner

which attains the technical effect of inducing proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells in the treated individual.

230 The effect of inducing proliferation or accumulation of Foxp3-positive regulatory T cells thus does not only define the selection of a subclass of bacteria as such for inclusion in the composition. Further, the achievement of this effect in the treated individual is required as a functional feature of the claim which forms part of the therapeutic use.

231 The use of the composition according to the claims as a treatment is expressly based upon the achievement of that technical effect.

232 That effect is, moreover, described in the Patent and substantiated by the experimental examples of the Patent as being associated with the types of bacteria that are recited in claim 1.

233 The case law on the question of whether an effect that is alleged to be achieved only "inherently" by a use described in the prior art is relevant to the novelty of a use claim based specifically upon that effect is well established, both in general, and specifically for medical uses. In G 2/88, the Enlarged Board of Appeal stated that this was a question –

> *"of a general nature, being primarily concerned with the question of interpretation of Article 54(1) and (2) EPC".*

234 As summarised in G 2/88, Headnote 3:

> *"A claim to the use of a known compound for a particular purpose, which is based on a technical effect which is described in the patent, should be interpreted as including that technical effect as a functional technical feature, and is accordingly not open to objection under Article 54(1) EPC provided that such technical feature has not previously been made available to the public"* [emphasis added].

235 When it is alleged, as in the present case, that the disclosure, e.g., of fecal slurry transfers in D5, is relevant for novelty of claim 1 which is based upon a technical effect upon Foxp3-positive regulatory T cells that is described only in the Patent, it is

thus necessary to assess whether the use directed to attaining that technical effect has been made available to the public in the sense of G 2/88.

The Enlarged Board in G 2/88 noted the principle of "implicit" disclosure whereby, e.g., a written description of how to carry out a process "*also makes available further information which is the inevitable result of carrying out such teaching*" [point 10 of the reasons; underlining added]. But the Enlarged Board distinguished that principle from the principle whereby novelty is acknowledged for claims relating to a use based upon a novel technical effect in cases where the prior art did not make available the relevant information on the effect. The Enlarged Board in G 2/88 clarified on a general and fundamental level that

> *"a line must be drawn between what is in fact made available, and what remains hidden or otherwise has not been made available"*
>
> [point 10 of the reasons].

236 The Enlarged Board considering claims to uses based upon novel technical effects in G 2/88 emphasised that in such cases–

> *under Article 54(2) EPC the question to be decided is what has been "made available" to the public: the question is not what may have been "inherent" in what was made available (by a prior written description, or in what has previously been used (prior use), for example). Under the EPC, a hidden or secret use, because it has not been made available to the public, is not a ground of objection to validity of a European patent"*
>
> [point 10.1 of the reasons]

237 The Enlarged Board thus concluded that

> *The attaining of such a technical effect should then be considered as a functional technical feature of the claim (e.g. the achievement in a particular context of that technical effect). If that technical feature has not been previously made available to the public by any of the means as set out in Article 54(2) EPC, then the claimed invention is novel, even though such technical effect may have inherently taken place in the course of carrying out what has previously been made available to the public.*

[point 10.3 of the reasons]

238 The Enlarged Board illustrated this principle by explaining that claims directed to the use of compounds to achieve the effect of controlling fungi were novel over prior art which disclosed a use of the same compounds which would, in the words of the Enlarged Board, "*inevitably have been inherently a use of such compounds for controlling fungi*", but which was silent on that effect. In such prior art, the relevant effect underlying the claimed use was not *"made available"* to the public within the meaning of Article 54 EPC (see point 10.2 of the reasons).

239 This basic legal principle under the EPC has been applied in a large body of case law of the Boards of Appeal relating to claims to second or further medical uses which were, just as in the present case, based upon a new specific effect and thereby led to a new clinical situation. The medical use claims based upon these effects were confirmed to be novel over prior art disclosures according to which the effect might well have been achieved "inherently", but in which that effect was not mentioned, was not recognisable, and thus "remained hidden" within the meaning of the jurisprudence of the Enlarged Board of Appeal (see: T 290/86, point 6 of the reasons; T 836/01, points 10-11 of the reasons; T 1642/06, point 2.1 of the reasons; T 1859/08, points 6-14 of the reasons; T 1955/09, points 5-12 of the reasons; T 2506/12, point 2.6 of the reasons). An "inherent" effect which remained hidden in the use of the prior art was not in fact "made available" for use, i.e., was not accessible to be exploited clinically, within the meaning of Article 54 EPC.

240 As summarised by the Board of Appeal in T 1955/09 (points 6 and 7 of the reasons):

> *"6. The attaining of a new technical effect is considered as a functional technical feature of a claim referring to the new use of a known substance. If that technical feature has not been previously made available to the public, then the claimed invention is novel, even though such technical effect may have inherently taken place in the course of carrying out what has previously been made available to the public (see decisions of the Enlarged Board of Appeal G 2/88 and G 6/88, OJ EPO 1993, 93 and 114; point (9) of the reasons for the decision).*
>
> *7. This principle has been followed in a large body of case law of the boards on claims relating to second or further medical uses of a known substance, inter*

> *alia in decision T 290/86 (OJ EPO 1992, 414), decision T 542/96 of 11 May 2000, decision T 509/04 of 2 July 2005 and decision T 1229/03 of 23 November 2006, which all acknowledged novelty in the case at issue. …"*

241 In T 836/01, claims directed to the use of interferon-β2 (IL-6) in the area of cancer therapy specifically by "*influencing tumor cell growth and differentiation*" and "*influencing terminal differentiation of cancer cells*" were held novel over prior art disclosing the use of "*the same composition (interferon-β2) for treating the same disease (cancer/tumor)*" (point 5 of the reasons), because the claims relied on a different, novel technical effect (points 7 and 10 of the reasons).

242 The Board found that, while both the prior art and the claims related to the use of interferon-β2 (IL-6) to treat cancer, the use of the prior art was based upon – and disclosed nothing else than – the indirect effect of this compound upon cancer cells by stimulating the patient's immune system to attack cancer cells. In contrast, the novel medical use claims were based upon a different technical effect, i.e., direct effect of the compound upon cancer cells:

> *"Document (D1) thus teaches an indirect effect of interferon-β2 on cancer cells. This is in clear contrast to the technical effect relied upon by the claimed invention, namely the direct influence of interferon-β2 on the tumor cell growth and (terminal) differentiation"*
> [point 7 of the reasons].

243 Considering initially only the effects concerned, these factual circumstances in T 836/01 are clearly comparable to the circumstances in the present case in which prior art such as D5 relates to nothing else than certain supposed – (though not proven) – direct, and competition-based effects that are termed "*colonisation resistance*" in D5, whereas the claims rely on an entirely different, novel effect, namely an indirect, immunological effect upon Foxp3-positive regulatory T cells.

244 In addition, while in D5 the compound concerned was simply the same, in the present case the difference between the uses of the prior art and the claims is yet further underlined in that in prior art citation D5 the direct, competition-based effect is attributed crudely to whole stool, whereas the novel, immunological effect according to the present claims is associated with more specific, selected bacteria.

245 Together, the identification of the new effect and its association with the more specific, selected bacteria as defined in the present claims have all of the practical, clinical implications and consequences on the immunological focus of the treatment, the patient group for whom such treatment is preferable, the entirely different, safer and also otherwise significantly improved modes of administration as already discussed in detail above.

246 The Board of Appeal in T 836/01 further explained that a new technical effect can, for example, confer novelty in this manner by: –

> *"8. … the opening a new field of application, the healing of a different pathology/ clinical situation, the creation of a distinct group or sub-group of subjects (either end-users or patients) or the new use must involve new physical means/measures for its practise.*
> [point 8 of the reasons, underlining added].

The Board then held that:

> *10. Turning to the present case, the conclusion cannot be drawn that the technical effect relied upon by the claimed invention, namely the direct influence of interferon-β2 on the tumor cell growth and (terminal) differentiation is a mere explanation of how interferon-β2 heals cancer. Rather, this effect identifies a new clinical situation, namely one in which it could be preferable to target the cancer cells themselves, not lymphoid cells or the immune system as in document (D1), in order to heal cancer. But since a new clinical frame is not separable, as an abstract concept, from a patient suffering under it, it must be concluded that this new clinical situation also identifies a new sub-group of subjects being treated.*
>
> *11. In view of the foregoing, the board is satisfied that the subject-matter of claims 1 and 2 at issue fulfils the requirements of Article 54(2) EPC."*
> [point 10 of the reasons, underlining added].

247 Likewise, for all the reasons already discussed in detail above, the identification both of the novel technical effect and of its association with the specific, selected type of bacteria as defined in the present claims is not a mere explanation of how crude fecal transfers may have therapeutic benefits. Also in the present case, in view of

the practical, clinical implications and consequences already discussed in detail above, this novel aspect of claim 1 indeed identifies a new clinical situation.

248 Firstly, in a direct parallel to the consideration of the Board of Appeal in T 836/01, point 10 of the reasons, as cited above, the present invention identifies a clinical situation in which it could be preferable specifically to treat patients by the indirect, immunological effect of increasing proliferation or accumulation of Foxp3-positive regulatory T cells, rather than to rely only on any other therapeutic approach not involving this specific immunological aspect, or not addressing it specifically, such as the direct and competition-based effects associated with "*colonization resistance*" in the case of whole-stool therapy according to D5. It is moreover relevant to consider that, particularly in patients in whom the specific effect of increasing proliferation or accumulation of Foxp3-positive regulatory T cells is desirable, it will often be undesirable to achieve the broad range of rather undefined effects that may be induced by the range of bacteria and other components of donor faeces contained in an FMT.

249 Thus, just as noted by the Board in T 836/01, point 10 of the reasons, also in the present case the new clinical frame is not separable, as an abstract concept, from an affected patient. This new clinical situation accordingly also identifies a new sub-group of subjects being treated, just as found by the Board in T 836/01.

250 Secondly, we recall that it is only the association of the specific effect and types of bacteria according to present claim 1 that make possible the entirely different, safer, and also otherwise significantly improved, practicalities of drug production and administration, as already discussed in detail above. For example, as mentioned, the medication can be simply in the form of a simple, safe, reproducible, capsule intended for regulatory T cell-stimulation, instead of large volumes of crude faecal slurry from a donor to be instilled into a patient with significant clinical risks, discomfort, inconvenience, coordinated efforts, time and costs, and ultimately with many possible unknown – maybe desirable or maybe undesirable – effects.

251 Thus, overall, the present claimed new specific use evidently <u>precisely</u> represents "*the opening a new field of application*", and "*involve*[s] *new physical means/measures for its practise*", as contemplated by the Board of Appeal in T 836/01, point 8 of the reasons.

252 Similarly, in T 1642/06, both the prior art and the claims were concerned generally with the use of a particular type of compound (a sigma receptor ligand, rimacazole in the prior art) for treating tumors. The medical use claims were held novel based upon a new effect, because the prior art disclosed only a direct effect on cancer cells, whereas the claimed invention was based upon an indirect effect, in this case via the inhibition of the neovascularisation of tumours, which was clinically relevant and thus created a new clinical situation. The Board reasoned (points 2.1.1 and 2.12 of the reasons):

> *"2.1.1 Document (1) is the only document considered by the Examining Division against novelty of the subject-matter of said claim.*
>
> *This document discloses the use of a sigma receptor ligand (rimacazole) for the preparation of a medicament for treating tumors (breast cancer) (see examples page 58, lines 10 to page 60, line 12).*
>
> *Since document (1) and claim 1 are both concerned with the same composition for treating the same disease, it has therefore to be decided whether the now claimed use represents further and different therapeutic use from that disclosed in document (1).*
>
> *Document (1) discloses the use of compositions for the purpose of inducing tumour cell division cycle arrest and/or apoptosis (see e.g., claim 1). Thus, document (1) teaches a direct effect on cancer cells. This is in clear contrast to the technical effect relied upon in claim 1, namely the indirect influence of sigma receptor ligands on tumour cells via the inhibition of the neovascularisation of tumours.*
>
> *This effect, moreover, identifies a new clinical situation, namely one in which it could be preferable to target the supporting vasculature of a tumour rather than the cancer cells themselves, for instance in cases where the cells are resistant to chemotherapeutic drugs.*
>
> *In view of the foregoing, the Board is satisfied that the subject-matter of claim 1 at issue fulfils the requirements of Article 54(2) EPC vis-à-vis document (1).*

> *2.1.2 On the basis of the above, the Board does not share the Examining Division's view that the subject-matter of claim 1 relates merely to the discovery of a new mechanism of action devoid of new applications, contrary to T 836/01 and T 290/86."*

253 Thus, fully in line also with T 1642/06, the subject matter of present claim 1 is also novel, because the specific use defined in claim 1 identifies a clinical situation in which it is preferable specifically to treat patients by the indirect, immunological effect of increasing proliferation or accumulation of Foxp3-positive regulatory T cells, as opposed to whole-stool therapy according to D5.

254 Similarly, in T 1955/09, both the prior art and the claim related to certain peptidic compounds for use in the treatment of bacterial or fungal infections. However, the claim was novel, because just as in the present case the claimed use required a clinically significant different effect. According to the prior art, the effect of such compounds underlying their uses against bacterial or fungal infections was their "*affinity for toxins and especially for fungal and bacterial toxins …*" and their ability to "*inhibit or neutralize such toxins*" (see point 4 of the reasons). In contrast, according to the express language of the specific medical use claim in question, the relevant effect upon which the claimed treatment was based was "*by killing said bacteria or fungi*" (see independent claim 1 in question and point 5 of the reasons).

255 Applying the reasoning of the Enlarged Board of Appeal in G 2/88 and further established case law relating specifically to the medical use area as discussed above, the Board found that the distinct effect on which the claimed invention was based rendered the claim novel. The new, direct effect upon bacteria or fungi in T 1955/09 identified a new clinical situation, namely "*one in which it could be preferable to target the infection itself*", not only indirectly the toxins produced by the bacteria or fungi causing the infection. The Board thus once again took into account a differentiation of a "direct" and an "indirect" effect on claims relating to second or further medical uses of a known substance, in a way which, as already pointed out for cases T 836/01 and T 1642/06 above, bears considerable analogy to the nature of the present circumstances.

256 The Board in T 1955/09 reasoned:

> *"8. Since document (D1) and claim 1 are both concerned with the same peptidic compounds for treating the same disease, it needs therefore to be decided*

*whether the use now claimed represents a further and different therapeutic use from the disclosure in document (D1).*

*9. Document (D1) disclosed the use of peptidic compounds for the purpose of inhibiting or neutralizing toxins produced by bacteria or fungi. Document (D1) thus teaches a direct effect of the compounds on the toxins produced. This is in clear contrast to the technical effect relied on by the claimed invention, namely the indirect influence of the peptidic compounds on the production of the toxins via their antibiotic action against the toxin producing bacteria or fungi.*

*10. The conclusion can not be drawn that the technical effect relied upon by the claimed invention, i.e. the antibiotic effect, is a mere explanation of how the compounds inhibit or neutralize toxins. Rather, this effect identifies a new clinical situation, namely one in which it could be preferable to target the infection itself, not merely the toxins produced by the bacteria or fungi causing the infection … .*

*11. The board notes that the above reasoning is analogous to the reasoning in two further decisions, i.e. T 836/01 of 7 October 2003 and T 1642/06 of 23 August 2007, on claims relating to second or further medical uses of a known substance and which acknowledged novelty in the case at issue based on the differentiation of a direct and indirect effect.*

257 Likewise, in the present case, the identification of the new specific effect and moreover its attribution to the specific types of bacteria as required in present claim 1 identifies a new clinical situation, namely one which, inter alia, it is preferable to treat patients by the indirect, immunological effect of increasing proliferation or accumulation of Foxp3-positive regulatory T cells, as opposed to any other therapeutic approach not based upon involving this specific immunological aspect, such as in D5, which instead only refers to a direct and competition-based "*colonization resistance*" effect can based on D5 only be associated with "whole-stool" and the entirety of bacteria contained therein. Moreover, the new situation identified by the present invention involves entirely "*new physical means/measures for its practise*" within the meaning of T 836/01 (point 8 of the reasons as cited above) and thus overcomes a multitude of severe disadvantages of the "fecal slurry" approach of D5, as discussed above in detail.

258 Thus, fully in accordance with the established legal position, at least the specific, indirect, immunological technical effect required by claim 1 renders the claims novel over prior art such as D5, in which this effect remains "hidden".

259 Further, T 1859/08 and T 2506/12, for example, link the line of case law discussed above (regarding prior art that discloses only an effect other than the clinically defining effect underlying the claims as in, e.g., T 290/86, T 836/01, T 1642/06, and T 1955/09), with further case law illustrating generally that the novelty of claims to specific medical uses cannot be called into question merely in view of "inherency" of the effect in a teaching in the prior art (T 158/96; T 385/07; T 715/03, also cited).

260 In cases T 1859/08 and T 2506/12, the medical use claims in question related to treatment of cancer, wherein the claims expressly required that a particular "*clinical benefit*" ("*clinical benefit as measured by an increased time to disease progression … and reduced myocardial dysfunction compared with…*"; T 1859/08) or "*effective therapy*" (T 2506/12) was to be obtained, going beyond the disclosed mere purpose or intention of treating cancer. The prior art disclosed the uses of compounds for treating cancer just as claimed, but did not disclose that the particular "*benefit*" or "*effect*" according to the claims was achieved. The Boards of Appeal in both cases confirmed that the achievement of the specific effect was required as a functional technical feature of the claims, and that the consideration that by applying the therapy according to the prior art "*one would inherently come to the claimed effect*" (T 1859/08, point 14 of the reasons) was not decisive and did not lead to a lack of novelty.

261 The Board of Appeal stated in T 1859/08, point 14 of the reasons:

> *"However, decision G 2/88, OJ EPO 1990, 93, see point 10.1) states: "Under Article 54(2) EPC the question to be decided is what has been "made available" to the public: the question is not what may have been "inherent" in what was made available". Therefore, while it may be true that the claimed effect is inherent once applying the claimed therapy, the decisive question to be answered by the board remains whether or not this effect was a "hidden" one or was accessible to the skilled person before the priority date of the patent in suit."*

262 The Board in T 2506/12 (point 2.6. of the reasons) summarised, also confirming the approach in T 1859/08:

> *"It is also not decisive whether the clinical benefit, or therapeutic effect, is inherent in the prior-art disclosure. The relevant criterion is whether it is accessible, i.e. disclosed, rather than "hidden" (see T 1859/08, reasons: points 13, 14)."*

263 In both cases, the medical use claims were thus novel over the prior art. The specific "*benefit*" or "*effect*" in T 1859/08 and T 2506/12 corresponds to the specific effect in the present case of inducing the proliferation or accumulation of Foxp3-positive regulatory T cells in the treated individual.

264 Thus, the well-established legal principles developed by the case law of the Boards of Appeal strongly support the novelty of the present medical use claims.

### 6.5 Claim 1 is novel over D6 (Borody et al.)

265 Opponents have also alleged that D6 is relevant for the novelty of the claims for reasons of alleged "inherency" analogous to D5.

266 D6 is a case report, on the uncontrolled, open-label administration of "fecal bacteriotherapy" or FMT to six patients with ulcerative colitis. D6 refers to this procedure by yet another name, "*human probiotic infusions*" ("*HPI*"; see the abstract, line 8). But it is evident from the "*MATERIALS AND METHODS*" section that the approach is the same. Donors and their stool were screened as far as possible for pathogens, and the instillations were by the rectal route. Patients needed to try to "*retain the enema for as long as possible (6-8 hours)*", and the "*process was repeated daily for 5 days*". D6 takes the position, essentially, that all six patients were cured.

267 Of course, at the outset, due to the fact that observations in D6 were not controlled in any respect and the very small patient group, it once again appears that no treatment effect at all has in fact even been shown in D6 by the normal, rigorous scientific criteria that apply to actual medical research in patients. Much as already discussed above in the context of D4 (paragraphs 174-177 above), It is not conclusively shown that the alleged treatment effect is not due to spontaneous remission or, e.g., the strong antibiotics which each patient received before the stool transfer (see page 43, column 2, first full paragraph). D6 itself speculates that "*the pathogenesis of UC may involve the presence of an as yet undescribed pathogen*"

(e.g., page 46, column 1, first full paragraph), and also acknowledges that "*UC can go into clinical remission*" (page 45, column 2, first paragraph under "*DISCUSSION*").

268 Indeed, a much more rigorous and scientifically meaningful trial to assess the efficacy of FMT in patients with UC supported only the conclusion that at least FMT does *not* have any clinically relevant therapeutic effect in the treatment of UC. See D77 which we file herewith.

269 The trial of D77 was "*double-blind, placebo–controlled, randomized*", n = 50 patients; see the Abstract and under "*Study Design*" on page 111, column 1). Patients of the treatment group were given faeces from healthy donors ("*FMT-D*"), and patients in the control (placebo) group were given a sample of their own (autologous) faeces ("*FMT-A*"). The Abstract of D77 summarises: –

> "*CONCLUSIONS: In this phase 2 trial, there was no statistically significant difference in clinical and endoscopic remission between patients with UC who received faecal transplants from healthy donors and those who received their own faecal microbiota…*"

270 In any event, the presently claimed specific medical use is clearly novel over the disclosure of D6, for at least the same reasons as discussed above in detail for D5. D6 is silent on the specific effect of inducing the proliferation or accumulation of Foxp3-positive regulatory T cells in the treated individuals. D6 is also silent on bacteria of Clostridium clusters IV and XIVa. D6 is also silent on the specific association between these bacteria and their effect on Foxp3-positive regulatory T cells as required by present claim 1.

271 This effect and thus its use as presently claimed, with all of the practical clinical implications as discussed in detail above in connection with D5, even if they could be accepted as being "inherent" as the Opponents allege (which we deny, see above), remain entirely "hidden" in D6 just as in D5. Thus, by the principles of the established case law discussed in detail above in relation to D5, the claimed medical use is novel over D6 (G 2/88, Headnote 3; points 6.1 and 10 of the reasons and, e.g., T 290/86, point 6 of the reasons; T 836/01, points 10-11 of the reasons; G 2/08, point 6.3 of the reasons; T 1642/06, point 2.1 of the reasons; T 1859/08, points 6-14 of the reasons; T 1955/09, points 5-12 of the reasons; T 2506/12, point 2.6 of the reasons).

### 6.6 Claim 1 is novel over D49 (Aas *et al.*)

272 O5 has also alleged that D49 is relevant for the novelty of the claims, for reasons of alleged "inherency" analogous to D5 and D6.

273 D49 is a case report on the treatment of 18 *C. difficile* Colitis patients by the FMT approach, i.e., administration of donor stool via a nasogastric tube. It is one of the studies cited and considered in D5 (it is reference 10 in D5).

274 As admitted in D49, the report suffers from "*limitations*", e.g., in that it was completely uncontrolled:

> *"This study was a retrospective examination of an uncontrolled series of cases treated by a single clinician. The stool transplantation protocol used in this case series calls for a pre-treatment course of vancomycin to reduce the infectious burden. It was not possible to differentiate between patients whose colitis resolved as a result of their pre-transplantation course of vancomycin and those whose colitis improved as a result of the stool transplantation itself.*
> [D5, page 584, column 2, penultimate paragraph]

275 The authors argue to a certain extent that the study is significant ("*each of the patients served as her or his own control*"), but ultimately admit that "*the use of donor stool has yet to be subjected to a randomised, controlled trial*" (see page 584, column two, first full paragraph).

276 In any event, the presently claimed specific medical use is clearly novel over the disclosure of D49, for at least the same reasons as discussed above in detail for D5 and D6. D49 is silent on the specific effect of inducing the proliferation or accumulation of Foxp3-positive regulatory T cells in the treated individuals. D49 is also silent on bacteria of Clostridium clusters IV and XIVa. D49 is also silent on the specific association between these bacteria and their effect on Foxp3-positive regulatory T cells as required by present claim 1.

277 This effect and thus its use as presently claimed, with all of the practical clinical implications as discussed in detail above in connection with D5, even if they were accepted as being "inherent" as the Opponents allege, remain entirely "hidden" in D49 just as in D5. Thus, by the principles of the established case law discussed in detail above in relation to D5, the claimed medical use is novel over D49 (G 2/88, Headnote 3; points 6.1 and 10 of the reasons and, e.g., T 290/86, point 6 of the

reasons; T 836/01, points 10-11 of the reasons; G 2/08, point 6.3 of the reasons; T 1642/06, point 2.1 of the reasons; T 1859/08, points 6-14 of the reasons; T 1955/09, points 5-12 of the reasons; T 2506/12, point 2.6 of the reasons).

**6.7 Claim 1 is novel over D55 (Atarashi)**

278 O6 alleges that the abstract D55 was published online in August 2010, before the second priority date. O6 has not discharged their evidential burden to prove this.

279 O6 rely on D64 and D65 as alleged evidence that D55 was published online in August 2010.

280 But D64 is merely the title page of a "*Wrap-up Report*" for a conference, providing no further evidence whatsoever of (1) what is inside the "*Wrap-up Report*", (2) when D64 was in fact published, and (3) (not least) when D55 was published. D64 does not appear to be relevant evidence.

281 D65 is a print-out of an internet page, apparently accessed recently, of an account on the internet of the "*14th International Congress of Immunology Kobe*", including an abstract corresponding to D55. However, D65 also does not provide any evidence whatsoever of the actual online publication date of either D65 or D55. All the information presented may have been made available online only after the second priority date. O6 has not proven to the required legal standard that the abstract as shown in D55 was in fact made available to the public either online or at the conference before the priority date.

282 In any case, even if O6 had proved that D55 forms part of the state of the art, D55 is a mere brief abstract which cannot be relevant to the novelty because it lacks both disclosure and enablement.

283 Firstly, D55 does not disclose all features of the claimed medical use. D55 merely provides a summary statement of a conclusion that components of intestinal commensal bacteria belonging to clusters XIVa and IV induce regulatory T cells. The authors also state that induction of regulatory T cells in the small intestine is affected by dietary antigens, independently of commensal bacteria. However, D55 does not disclose any use in a therapeutic method as required by claim 1. For this reason alone, claim 1 is novel over D55, for failure of D55 to disclose all relevant features of the claim.

284 Secondly, in contrast to the present patent, D55 does not include any relevant data to enable its mere "verbal statement" of an effect. D55 in particular does not provide any reproducible, enabling description of any experiments which the skilled person could follow to reproduce such data. At least such a description and a sufficient disclosure of actual data obtained would, however, be required to enable a disclosure of any medical use as claimed, in accordance with the case law discussed above (T 609/02, point 9 of the reasons; see, e.g., also T 801/06, point 28 of the reasons; also T 158/96, point 3.4.1 of the reasons; T 385/07, point 9 of the reasons; T 715/03; points 2.2-2.3 of the reasons; T 1859/08, points 6-14 of the reasons; cited in the Case Law of the Boards of Appeal, 8th ed. 2016, page 103) – even if a relevant medical were mentioned, which it is not.

***

285 Thus, in conclusion, the subject matter of claim 1 is novel over all cited prior art documents. This establishes the novelty of all claims, as the remaining claims depend from claim 1.

## 7 Inventive step

### 7.1 Introduction

286 The Opponents' arguments under Article 56 EPC also fail. The claimed subject matter involves an inventive step. The Opponents have presented two types of arguments. On the one hand the Opponents have alleged that various combinations of cited prior art documents would have led the skilled person to the claimed subject matter. On the other hand, the Opponents have alleged the absence of a relevant technical effect for the combination of clusters IV and XIVa as recited in claim 1.

287 Both of these lines of attack fail for the following simple reason alone: Despite all the research and speculation in the prior art on the question of which commensal bacteria might be responsible for which physiological effect, and how such insights, once obtained, might be exploited medically, it was only the pivotal research and teaching in the present Patent which finally established a concrete link specifically between bacteria of Clostridium clusters IV and XIVa and the immunological effect of inducing Foxp3-positive regulatory T cells. It was thus only the present Patent which credibly made available the use of this technical effect for the treatment of diseases

in accordance with claim 1. Prior to this breakthrough in microbiome research which the Patent contributed to the art, this link had not been established. Thus neither this link nor the specific medical use as claimed was obvious to the skilled person within the meaning of Article 56 EPC as assessed under the problem-solution approach.

288 As mentioned above, D1 and D2 are not prior art, because the present claims are entitled to the second priority date, and these documents were published only later. The same applies to D59 which is discussed by O6 under Article 56 EPC.

### 7.2 D8 as the closest prior art

289 O1, O4 and O5 have taken D8 as the closest prior art. D8 relates, broadly speaking, to the objective of characterising the relationship between components of the microbiota and the host immune system, including different T-cell responses. D8 addresses this question essentially in the context of normal mouse development. In D8, comparisons are made between germ-free mice and mice obtained by colonising such germ-free mice with various preparations of whole faeces or fractions thereof, and, finally the specific bacterium SFB. SFB is <u>related to</u> the broad class of Clostridia, but <u>does not belong to</u> either of Clostridium clusters IV or XIVa.

290 D8 does not disclose any treatment of any relevant infectious, autoimmune or allergic disease. D8 also does not relate bacteria of Clostridium clusters IV and XIVa to the effect of induction of Foxp3-regulatory T cells.

291 In D8, intestinal gene expression in germ-free mice is compared initially to each of conventional (i.e., essentially normal) “Cv” mice and “conventionalised” “Cvd” mice (which are the result of colonising germ-free mice with <u>whole</u> fecal microbiota from Cv mice). See D8, Table 1, Figures 1 and 3A.

292 D8 in Table 1, on page 678 (end of column 1) and in Fig. 3A mentions a long list of changes in gene expression in “Cvd” mice compared to germ-free mice, including an increase in Foxp3 mRNA expression, alongside many other changes in gene expression. These experimental data, however, relate only to the general effects on gene expression of <u>whole</u> mouse fecal microbiota, relative to mice that are abnormal only in that they are entirely germ free. For example, strong increases in the expression of pro-inflammatory genes such as IL17, relative to the germ-free mice,

are also observed. In fact, at day 20, the increase in IL17 expression is over 1000-fold as compared to a modest 5-fold increase in Foxp3 expression. Fig 3A, as far as it relates to "Cvd mice", merely shows that colonisation with whole mouse fecal microbiota increases various gene expression levels (of which Foxp3 is just one amongst many) relative to germ-free mice. These data provide no link whatsoever between any specific types of bacteria and any particular individual effect and/or therapeutic treatment.

293 D8 reports that many of these effects on gene expression were lost when a cultured fraction of the mouse faecal microbiota was used (right-hand portion of Table 1, and page 680, first full paragraph). In particular, for example, a pronounced loss in the expression of pro-inflammatory cytokines, e.g., IL17, was observed.

294 We note immediately that, in contrast to other genes, a certain increase in IL10 and Foxp3 expression relative to germ-free mice was, in fact, still seen after inoculation with the cultured fraction (Table 1 and Fig3A; "*though only in some animals*", p.680, column 1, line 11). Thus, though of course many effects were of interest overall in D8, the skilled person would have noted that the effects upon these particular genes seem to be associated to some extent with the cultured (non-sporulated) fraction, in contrast to other genes of interest in D8 (page 680, lines 9-11; Figure 3A). D8, accordingly, also contains further teaching in this regard on page 686, column 1, lines 5-9 from the end of the first full paragraph; see below).

295 Further, essentially no effects on gene expression were seen any more when germ free mice were colonised with whole, fresh human faecal microbiota (page 678, column 2, last paragraph; Figures 1A, 1B, 3A). The authors of D8 therefore formulated an express expectation that studied effects would be associated with a bacterium contained specifically in the mouse flora:

> *"To explain the disparity between human and mouse flora effects, we postulated that the mouse flora contain specific bacterial species capable of stimulating immune activity in the gut over and above that induced by the predominant microbial groups, commonly found in both human and mouse gut microbiota".*
>
> [Sentence bridging pages 678, last paragraph and 680, first paragraph]

296 The authors of D8 reasoned that the loss of the effects on gene expression when the cultured mouse fractions and also the human fractions were administered may be

due to a loss of the relevant bacterial species (see page 680, last 8 lines of column 1, and first paragraph of column 2).

297 Following an analysis of these fractions by FISH, the authors noted that, generally, these fractions contained fewer bacteria of the "*Clostridium family*" (page 680, column 2, lines 5-6), which are often (though not always) spore-forming (D8 formulates this latter aspect as "*typically sporulated*"; page 680, column 2, paragraph 1). When the passage of page 680, column 2, paragraph 1 is read in its full context, it is clear that the statement authors of D8 are actually making overall is concerned with a very general notion of the "*Clostridium family*", which D8 also refers to very broadly as "*Clostridia-related bacterial species*" (page 680, column 2, line 9). This refers to a very large group of bacteria encompassing all clostridial "clusters" and – significantly – moreover other "related" phylogenetic groups.

298 We also note that D8 on page 680, column 2, paragraph 1, discusses this large group of "*Clostridia-related bacterial species*" only superficially in connection with "*adaptive T cell responses*" in general, and not specifically in connection with Foxp3-positive regulatory T cells.

299 D8 is not specifically concerned with the two clostridial clusters that are recited in present claim 1. The mere fact that, e.g., Fig. 3B shows that, e.g., whole faeces of conventional mice, human stools, or the stools of mice colonised by either cultured or human flora, contain representatives of these clusters alongside various other bacteria does not amount to a teaching as in the Patent specifically linking these bacteria to the effect of inducing Foxp3 positive regulatory T cells and their use to achieve this effect in the treatment of relevant diseases. Bacteria of these clostridial clusters, alongside many other bacteria which are also represented in Fig. 3B and the data of D8, have long been known to be components of whole faeces, both in mouse and human. Their mere mention in D8 is not significant for the present assessment under Article 56 EPC.

300 In this respect, the Opponents clearly wish to extract more information from D8 can than objectively be justified. We note for example that, while the authors of D8 on page 680 initially mention "*bacteria in the Clostridium coccoides group*" as an example of a difference noted between flora of conventional mice and mice colonised with a cultured fraction, contrary to the allegation by, e.g., O1 (paragraph 8.5 of O1's opposition statement), the authors do not single out *Cl. leptum*. *Cl. leptum* group is merely one of the various examples tested in Fig. 3B, alongside other

typical fecal bacteria. In reality, as mentioned above, the initial reference on page 680 to the *Clostridium coccoides* group is merely a lead-in to the passage on page 680 referring very broadly to "*Clostridia-related bacterial species*" in general.

301 The following may, for example, also put the Opponents' rather too creative interpretation of D8 and in particular Fig. 3A and B into perspective: while at least some bacteria from one or both of the two groups in question appear to be present alongside other bacteria in, e.g., the humanised mice – and indeed apparently to a greater extent than in the culturable / non-sporulated flora – the last panel of Fig. 3a shows a clear decrease in Foxp3 mRNA expression in the humanised mice relative to both "conventionalised" Cd mice and the Cult mice colonised with cultured fractions. This teaching in D8 (while not conclusive either way, because this is not the topic of D8) would, if anything, have tended to suggest to the skilled person that these two representatives of the "*Clostridium family*" are unlikely to be linked to an increase in Foxp3 mRNA expression.

302 Overall, although Foxp3 mRNA expression levels are studied amongst other genes, and although Clostridia are mentioned alongside other typical faecal bacteria, D8 does not disclose any link specifically between the two clostridial clusters that are defined in claim 1 and the effect of inducing Foxp3-postive regulatory T cells. Much less, of course, does D8 disclose any medical application of these types bacteria based upon this effect, as claimed by the Patent.

303 To the contrary, from the end of page 680 onwards, the teaching of D8 focuses entirely on the specific bacterium SFB. SFB, according to D8, is the "*Clostridia–related unculturable bacterium*" of interest (see page 680, column 2, paragraph 2, line 11 onwards). Monocolonization experiments of mice with SFB are performed, and D8 draws the conclusion that "*SFB is a key inducer of intestinal T cell responses*" (page 681, column 1, title of the first paragraph). Fully in accordance with the title of D8 overall, essentially the entire remainder of D8 is concerned with a description of the effects of SFB on various intestinal T cell responses.

304 D8 does not disclose or even hint at a concrete medical application of SFB. The final sentence of D8 refers to a "*notion*", in extremely general terms, that "*changes in the infant flora may influence the development of host immune responses and thereby the susceptibility to inflammatory and autoimmune disease*". But this is evidently no more than a very generally expressed speculative theory or hypothesis, which the skilled person would also perceive to be made more in the context of developmental

biology than in the context of therapeutic medical applications of either SFB or any other bacterium. D8 of course also does not disclose a medical application of any other specific type of bacterium.

### 7.3 Objective technical problem over D8 and its solution

305 The present Patent plausibly establishes the link, specifically between bacteria of Clostridium clusters IV and XIVa and the immunological effect of inducing Foxp3-postive regulatory T cells. By recognising the therapeutic implications of this insight, the present Patent provides that specific immunological effect for the medical applications as defined in claim 1.

306 The objective technical problem over D8 is therefore to provide induction of Foxp3-postive regulatory T cells for treatment of infectious, autoimmune and allergic diseases.

307 The extensive experimental data in the Examples of the Patent show that this technical problem has indeed been plausibly solved. Throughout the Examples of the Patent, there is a consistent focus on describing the relationship between specific types of commensal bacteria and the proliferation or accumulation of Foxp3-postive regulatory T cells, including relevant disease models (see in particular Examples 15 and 16), culminating in the clear teaching that it is, in particular, bacteria of Clostridium clusters IV and XIVa which provide induction of Foxp3-postive regulatory T cells for treatment of infectious, autoimmune and allergic diseases.

308 No reason exists to doubt this teaching. As mentioned, scientific publication D1 which corresponds to part of the experimental data in the Examples of the Patent, was considered to be so significant and far-reaching that it was featured on the cover page of the highly prestigious journal Sc*i*ence. This underlines the significance of the technical contribution to the field made by the inventors' recognition of the link between Clostridium clusters IV and XIVa and the induction of Foxp3-postive regulatory T cells. As is demonstrated, e.g., by D29 (filed by O3), corresponding pharmaceutical compositions are indeed being developed and have already completed successful pre-clinical studies. See also D68, page 6, columns 1 and 2, in the section entitled "*COCKTAILS OF Clostridium CLUSTER IV AND XIVA MEMBERS*", as cited above the Introduction to this submission.

309 We note that, under the correctly formulated problem-solution approach, in view of the nature of the invention which is described above and defined in relation to the

closest prior art, arguments of O1 (and later other Opponents) focusing upon comparisons of data relating to combinations of bacteria to individual strains are not appropriate or relevant in any way. The same applies to allegations by Opponents that, for an inventive step to be acknowledged, some particular "synergy" of a combination of bacteria of Clostridium clusters IV and XIVa needs to be demonstrated, compared to bacteria of an individual strain.

310 Such arguments are incorrect, because they are based upon the wrong comparison. They are not consistent with the problem-solution approach that applies to the present case, in that they are not based upon a correct comparison with the closest prior art. The effect upon which the objective technical problem is based is derived from a comparison of the features of the claim with the closest prior art. As explained above, the closest prior art in the present case does not disclose that any individual strain of either of Clostridium clusters IV or XIVa alone has the effect of inducing Foxp3-positive regulatory T cells, and accordingly does not disclose any use of any such individual strain based upon this specific effect as claimed.

311 For this simple reason alone, it is not necessary or relevant in the present case to compare the effect of a combination to the effect of individual strains. It is thus, a fortiori, not necessary or relevant to require any form of "synergy" in such a comparison. Such comparisons are clearly incorrect under the problem-solution approach in the present case. The relevant effect of the features distinguishing the specific uses as presently claimed from the closest prior art (D8), and thus the objective technical problem, are independent of any synergy or other effect pertaining specifically to the combination.

312 The focus by O1 and other Opponents upon the combination and the artificial question of "synergy" appear merely to be attempts to detract from the actual nature of the invention and from the fact that the uses as claimed do involve an inventive step if assessed rigorously under the problem-solution approach by comparison to the closest prior art. Such arguments by the Opponents aim to detract from the fact that, relative to the closest prior art, the invention resides in the non-obvious fundamental insight that it is bacteria of Clostridium clusters IV and/or XIVa which are responsible for the effect of inducing Foxp3-positive regulatory T cells and therefore solve the objective technical problem as formulated above.

313 Claim 1 may recite Clostridium clusters IV and XIVa "*in combination*" and, as discussed above in the context of the basis in the original disclosure, the Proprietor was indeed free to limit claim 1 in this way. But in view of the state of the art before the present invention, this feature "*in combination*" as such is not in fact decisive under Article 56 EPC. On the basis of the relevant comparison with the closest prior art, the establishment of the link between bacteria of the type specified in the claim and the effect of inducing Foxp3-postive regulatory T cells was nonobvious regardless of whether or not bacteria are employed in combination.

**7.4 The claimed solution was not obvious over D8**

314 The solution to the objective technical problem as claimed would not have been obvious in view of D8. Neither the link between Clostridium clusters IV and XIVa and the induction of Foxp3-postive regulatory T cells nor the medical implications and applications thereof would have been obvious to the skilled person starting from D8. The establishment of the link between Clostridium clusters IV and XIVa and the specific effect of inducing of Foxp3-postive regulatory T cells is, of course, also not arbitrary.

315 As mentioned above, after referring to a very broad range of "*Clostridia-related bacterial species*" in general as being of potential interest for a broad range of effects relating to the "*maturation of the intestinal adaptive T cell responses*" in general (D8, page 680, column 2, last line of paragraph 1), D8 focuses upon SFB. D8 therefore departs in a completely different direction compared to the present Patent.

316 SFB is indeed a "*Clostridia-related bacterial species*" of the general type to which page 680 of D8 refers, also from the "unculturable" fraction. But it is not a representative of Clostridium clusters IV and XIVa. D8 concludes from an analysis of lamina propria lymphocytes (LPL) that SFB "*simultaneously induced strong Th1, Th2, Th17, and regulatory T cell responses*" (page 681, column 2, last paragraph). D8 further teaches that "*collectively, these results indicated that SFB was a critical component of the normal microbiota able to efficiently drive the coordinated maturation of intestinal T cell adaptive functions*". D8 focuses strongly upon that organism as being "*pivotal*" to the "*immunostimulatory properties of the flora*" (page 683, columns 1 and 2).

317 As is clear from the cited passages, D8 teaches that SFB is responsible for an entire range of T cell responses. D8 particularly notes, e.g., the increased IL-17 expression that is observed upon colonisation by SFB, but a certain increase in Foxp3 mRNA is also reported to be induced by this bacterium (page 681, column 2, first full paragraph).

318 The skilled person facing the objective technical problem over D8 would therefore have focused upon SFB and would thus not have arrived at the claimed invention in an obvious manner. D8, while relating to a similar question on the most general level, D8 ultimately teaches away from the presently claimed invention.

319 Specifically in connection with Foxp3 and the induction of regulatory T cells, D8 otherwise merely notes, somewhat vaguely, that: –

> *"Induction of Foxp3 and/or IL10 mRNA was observed in a few mice colonised with culturable flora, stressing the possibility that some culturable species alone or in association with SFB may promote the induction of regulatory T cells"* [D8, page 686, column 1, lines 9-5 as counted from the end of the first full paragraph].

320 This teaching in D8 is consistent with our comments above in connection with the (still entirely inconclusive) data of D8 obtained from colonisation with *culturable* species. Had the skilled person followed this pointer, D8 would once again ultimately have led the skilled person away from the bacteria of Clostridium clusters IV and XIVa which are identified as being associated specifically with the effect of inducing Foxp3-positive regulatory T cells in the present claims. In any event, even in this context, the authors of D1 do not move away from their strong focus upon SFB, as the possibility of such culturable species in association with SFB is also mentioned, fully in accordance with the teaching of D8 overall.

321 The data in Figs. 3A and B on which some Opponents have commented would, if anything, also have led the skilled person facing the objective technical problem away specifically from bacteria of the *Cl. leptum* and *Cl. coccoides* groups for the following, further reason: The relative proportions of various faecal bacteria contained in the faeces of "Humanised Mice" as shown in Fig. 3B of D8 would appear to indicate that reasonably large amounts of bacteria of the *Cl. leptum* and *Cl. coccoides* groups are still present in the faeces of these mice. This, however, is paired with a sharp decrease of Foxp3 mRNA expression in these humanised "Hum"

mice, compared, e.g., to both conventionalised "Cvd" mice (colonised with mouse whole faecal microbiota) and "Cult" mice (colonised with a culturable fraction thereof), as shown in the last panel of Fig. 3A.

322 Also in view of this disclosure in D8, the skilled person desiring to induce Foxp3-positive regulatory T cells in accordance with the objective technical problem would not have considered bacteria of the *Cl. leptum* and *Cl. coccoides* groups in an obvious manner.

323 Overall, the most obvious solution for the skilled person facing the objective technical problem and starting out from D8 would clearly have been to focus upon SFB. The skilled person would therefore not have arrived at the presently claimed subject matter in an obvious manner.

### 7.5 Combinations with D8 do not render claim 1 obvious

324 D9, D10, D13 or D40 have been proposed for combination with D8. But these documents do not close the gaps between D8 and the presently claimed invention in an obvious manner. Although these documents may mention Clostridium clusters IV and XIVa (and/or representative members of these clusters), they are completely silent on the relevant effect of inducing Foxp3-positive regulatory T cells. These documents therefore do not go beyond the teaching of D8.

325 Moreover, D9 and D10 do not even relate to relevant medical applications. These documents merely characterise the "normalisation" of mice which are abnormal specifically in that they are "germ free".

326 D13 relates only to the effect of butyric acid production which, while broadly associated with anti-inflammatory effects, is distinct from the specific effect of inducing proliferation or accumulation of Foxp3-positive regulatory T cells according to claim 1 of the present Patent.

327 D40 mentions that bacteria from the "*C. leptum* and *C. coccoides* groups" appear to be underrepresented in certain patients with acute inflammatory bowel disease ("*A-IBD*") and infectious colitis ("*IC*") (see the abstract). However, this is does not necessarily or obviously associate these bacteria with the effect of inducing Foxp3-positive regulatory T cells. Generally, a mere decrease of the levels of certain

bacteria in patients with intestinal diseases cannot render obvious the conclusion that these bacteria induce Foxp3-positive regulatory T cells.

328 Moreover, considering that D8 ultimately teaches away from Clostridium clusters IV and XIVa and toward SFB (or possibly some undefined components of the culturable fraction), it would not have been obvious for the skilled person to combine D8 with any disclosure relating to bacteria of Clostridium clusters IV and XIVa at all.

329 O5 also proposes the combination of D8 with D6 or D49. But D6 or D49 relate only to FMT, the administration of whole stool. As already discussed above under the heading of novelty, any effect of bacteria of Clostridium clusters IV and XIVa upon the induction of Foxp3-positive regulatory T cells (if even achieved at all by such treatments) remains hidden in such documents. Even if it were assumed for the sake of argument that the effect is achieved (which cannot, in fact, simply be assumed in the case of these documents), a "silent", "inherent" effect can be no more relevant under Article 56 EPC than under Article 54 EPC. The achievement of an effect that is merely "silently" or "inherently" achieved cannot be obvious to the skilled person. Thus, for this reason alone, such documents would also not have led the skilled person from D8 to the claimed invention in an obvious manner.

330 The present invention resides in recognising that this effect is associated specifically with Clostridium clusters IV and XIVa, such that the effect and its medical uses as defined by present claim 1 are made expressly available to the public.

331 Moreover, the skilled person facing the objective technical problem and starting from D8 would not have had any particular reason to expect that the human stool described in documents such as D6 or D49 would contain SFB, because SFB would not generally have been considered a normal component of the healthy human faecal microbiota. The skilled person would thus have had no motivation whatsoever to combine D8 with documents describing FMT such as D6 or D49.

332 O5 appears to propose the combination of D8 with D11. But as admitted by O5 in paragraph 192 of their submission, D11 is silent on the effect of inducing Foxp3-positive regulatory T cells. For that reason alone, D11 does not go beyond the teaching of D8 and cannot provide the presently claimed solution to the objective technical problem in an obvious manner.

333 Moreover, D11 describes only strain A2-165 of *Faecalibacterium prausnitzii.* As mentioned above (paragraph 142), D69 provides evidence that this particular strain of *Faecalibacterium prausnitzii* does not induce Foxp3-positive regulatory T cells. In D69, five different strains of *F. prausnitzii* were tested. It was shown that each of these *F. prausnitzii* strains had different capacities to induce IL-10 and other cytokines (see D69, page 3, Fig. 1). Figure 8b on page 9 of D69 shows specifically that strain A2-165 of *F. prausnitzii* does not induce Foxp3-positive regulatory T cells. Thus, any application by the skilled person of the teaching in D11 could not even "inherently" lead to a "hidden" or "uninformed" use according to present claim 1. In any event, as mentioned above, even such an "inherent" use is not detrimental under either Article 54 or 56 EPC in the present case, because the relevant effect upon which the new, claimed use is based is not in fact made available and is also not obvious to the skilled person. Further, of course, the fact that D11 is silent upon the specific effect of inducing Foxp3-positive regulatory T cells is only consistent with the fact that the strain studied in D11 does not have the effect.

334 We further note that O5 (possibly with different strains of *F. prausnitzii* in mind, but in any case without further substantiation) in paragraph 192 of their submission appears to refer to the article in Nature D16 by the present inventors as though it had been available to the skilled person as prior art for the purposes of the assessment under Article 56 EPC. That was, of course, not the case. D16 was published only in 2013.

## 7.6 Other approaches by the Opponents

335 O3 proposes documents D5 or D6, which relate to FMT, as starting points for the problem-solution approach. But these documents would not appear to be more relevant as starting points than D8, because, as discussed in detail under Article 54 EPC, these documents do not even mention the effect of inducing Foxp3-positive regulatory T cells in any way. These documents are completely silent on the specific effect upon the present claims are based and its association with Clostridium clusters IV and XIVa.

336 For the sake of completeness, the objective technical problem over such documents would simply to be the same as over D8. None of the further document cited by O3 would have provided the solution to this problem as claimed in an obvious manner. As discussed in detail under Article 54 EPC, D3 and D4 are severely defective, non-

enabled documents. The skilled person would not have expected these documents to provide a solution to the objective technical problem. In any event, D3 and D4 are silent, inter alia, on the relevant effect and therefore cannot render the claimed subject matter obvious to the skilled person starting out from the disclosure of FMT in either D5 or D6. Likewise, both D34 and D35 are simply silent on the relevant effect and therefore cannot close the gap between D5 and D6 and the subject matter of claim 1.

337 O4 relies, in one alternative, upon D11 as closest prior art. As discussed above, D11 relates to *F. prausnitzii* strain A2-165. This bacterium is discussed and studied in the context inter alia of Crohn disease and a mouse model of ulcerative colitis (UC). D11 refers to the bacterium merely as "*anti-inflammatory*" (see the title), and is silent on the more specific effect of inducing Foxp3-positive regulatory T cells. D11 therefore also does not appear to be more suitable than D8 as a starting point for the problem-solution approach. Indeed, as discussed above, D69 (Figure 8b, page 9) provides evidence showing that strain A2-165 of *F. prausnitzii* does not have this effect. The objective technical problem over D11 would be formulated just as in the case of D8.

338 D8, as proposed by O4, could not close the gap between D11 and the present claims in an obvious manner, because D8 would, if anything, have taught the skilled person desiring to induce Foxp3-positive regulatory T cells only to use SFB, and/or to research the cultured fraction of fecal microbiota without any further guidance whatsoever. D8 would, in fact, on closer inspection expressly have taught away from Clostridium clusters IV and XIVa for all of the reasons discussed in more detail above in sections 7.2 and 7.4.

339 D37 would also not have rendered the present claims obvious starting out from D11, because this document is also simply silent on the effect of inducing Foxp3-positive regulatory T cells. D37 merely reports decreases in the levels of various bacteria in IBD patients, listing other types of bacteria (in particular *Bacteroides*, esp. *B. fragilis*, *Atopobium*) in addition to the potentially relevant *Clostridia*, indeed focusing particularly on the "*B. fragilis* group" (see p. 466). In any event, as mentioned previously in the context of similar documents, a mere decrease of the levels of certain bacteria in patients with intestinal diseases does not obviously lead to the conclusion that such bacteria have a specific effect of inducing Foxp3-positive regulatory T cells.

340 D38 would also not have rendered the present claims obvious starting out from D11. We note that D38 is merely a commentary on D11. O4 argues that D38 would have led the skilled person to add *C. coccoides* (cluster XIVa) to the *F. prausnitzii* of D11. However, the skilled person would have been well aware that, as a commentary on D11, D38 contributes no data whatsoever of its own and in principle does not go beyond the teaching of D11. Interestingly, fully in line with this, even when D38 refers to concentrations of *C. coccoides* being low in certain patients (page 16414, end of middle column), D38 suggests only using *F. prausnitzii* alone as a probiotic, and thereby does not go beyond the teaching of D11, upon which D38 is based. Nothing in D38 in fact suggests any particular combination. Moreover, on a general level, D38 also refers to other bacteria, such as *Lactobacilli*, as having an immunoregulatory effect (e.g., page 16414, middle of first column).

341 Further, D38 even casts doubt upon the teaching of D11, by pointing out a lack of an important media control in the 20-day survival study (D11, Fig. 7), which means that it cannot be excluded that in fact even the effects observed in D11 may be due at least in part to the culture media alone.

342 In any event, D38 once again is entirely silent on the relevant effect of inducing Foxp3-positive regulatory T cells. The combination of D11 and D38 would not have brought the skilled person any closer to the presently claimed invention, and would clearly not have rendered the claimed specific use obvious.

343 D40, if combined with D11, would also not have rendered the claimed specific use obvious, for the reasons already discussed above in the context of D40 (see paragraph 327).

344 O6 proposes D61 as an alternative starting point for the problem-solution approach, for combination with D9. But D61 neither discloses relevant bacteria nor relates to a relevant effect. D6 is clearly not closer prior art than D8. In order to argue that D61 relates to a relevant effect, O6 appears to argue that claim 1 can be interpreted in a non-literal, broadening manner as covering, e.g., an effect upon Foxp3-negative regulatory T cells (sections 5.2. on page 24, and sections 1.2 and 1.3 of O6's opposition statement).

345 O6 here relies on an approach to claim interpretation that is entirely inconsistent with both the clear wording of claim 1 and the usual conventions of claim interpretation under Article 69 EPC. O6 argues for an interpretation that departs from the clear meaning of the claim terms the Patent as granted by reference to a passage on page 26 of the description of the application as filed (see section 1.2 of O6's opposition statement), even though that passage is in fact no longer present in the Patent is granted following the revisions to the description in accordance with the amended claims of November 18, 2015. O6 is not following a correct approach to interpretation of patent claims.

346 In fact, the claims clearly require an effect on Foxp3-positive cells, and no question of interpretation even arises. D61 is silent on this effect. The objective technical problem therefore once again remains the same. Further, as already mentioned above, although D9 may mention Clostridium clusters IV and XIVa, D9 is, just as D61, completely silent on the relevant effect of inducing Foxp3-positive regulatory T cells, and thus on any notion that bacteria of these two clusters can be put to the specific medical use as claimed. The combination D61 and D9 as proposed by O6 thus also does not render the subject matter of the present claims obvious.

### 7.7 Conclusion under Article 56 EPC

347 Thus, the cited documents, taken either alone or in combination, do not render the subject matter of the present claims obvious. The present invention as defined in claim 1 meets the requirements of Article 56 EPC.

## 8 Sufficiency of disclosure

348 The Opponents also raised the ground of Art 100(b), however, the Patent sufficiently discloses the claimed invention. As already discussed above in the context of non-enabling prior art, the requirements for the sufficient disclosure of medical use inventions under the EPC are well established by the case law of the Boards of Appeal. At least some experimental data of a pharmacological nature are generally required in the disclosure to render the cause and effect underlying a proposed medical use credible (T 609/02, point 9 of the reasons; see, e.g., also T 801/06, point 28 of the reasons; also T 158/96, point 3.4.1 of the reasons; T 385/07, point 9 of the

reasons; T 715/03; points 2.2-2.3 of the reasons; T 1859/08, points 6-14 of the reasons; cited in the Case Law of the Boards of Appeal, 8th ed. 2016, page 103).

349 The present Patent more than sufficiently satisfies this legal standard. As already mentioned in section 7.3 above in the context of Article 56 EPC and the solution of the objective technical problem, the Examples of the Patent contain extensive experimental data credibly establishing the pharmacologically relevant technical relationship between bacteria of Clostridium clusters IV and XIVa and the specific, therapeutically relevant effect of inducing the proliferation or accumulation of Foxp3-postive regulatory T cells, in accordance with the specific medical use defined in claim 1. These data include relevant in-vivo disease models, in which symptoms relating to autoimmune diseases (Example 15: two different mouse models of colitis) and allergic diseases (Example 16: systemic IgE production) were alleviated.

350 The Opponents have not established any concrete, serious reason to doubt the fundamental teaching in the Patent that bacteria of Clostridium clusters IV and XIVa induce the proliferation or accumulation of Foxp3-postive regulatory T cells and therefore have corresponding, specific therapeutic applications based upon this effect, as presently claimed.

351 To the contrary, corresponding pharmaceutical compositions based precisely on the groundbreaking insight disclosed in the present Patent are today being developed successfully for each of infectious, autoimmune and allergic diseases, and have already completed successful pre-clinical studies. See, e.g., D29 (filed by O3), and also the recent independent review of the relevant technical field in D68.

352 In D68, in the section entitled "COCKTAILS OF *Clostridium* CLUSTER IV AND XIVA MEMBERS", the technical effect taught by the Patent is emphatically confirmed on page 6, column 1:

> *"Clostridium spp. belonging to clusters IV and XIVa (also known as Clostridium leptum and coccoides groups, respectively) are exceptional inducers of Tregs in the colon and can be considered as therapeutic options for IBD and allergies"*

353 Further, as already quoted above in the introduction to the submission, this same passage of D68 further confirms that compositions corresponding to the fundamental teaching of the present Patent are indeed successfully being developed by licensees under the present Patent:

> *"… formulations including strains belonging to Clostridia classes IV and XIVa were designed to modulate the immune response (Atarashi et al., 2013). The original community of 17 strains (VE202) was developed by Vedanta Biosciences and Johnson and Johnson* [i.e., holders of rights under the present Patent]*, and has provided an effective treatment for autoimmune disorders*...

354 As already mentioned, scientific publication D1 which corresponds to part of the experimental data in the Examples of the Patent, was considered to be so significant and far-reaching that it was featured on the cover page of the highly prestigious journal *Science*. The current successful development of therapies across the scope of the claims based upon the essential, groundbreaking teaching of the present Patent fully confirms that this assessment was fully justified. There is no concrete reason, substantiated by verifiable facts (T 19/90) to doubt that the skilled person can carry out the invention as defined in claim 1. The ground of opposition under Article 100(b) EPC therefore does not arise.

355 Some of the Opponents have objected to the term "*spore-forming*" under Art. 100(b), but this appears, if anything, to be an objection relating to a question of clarity (Art. 84 EPC, not a ground of opposition).

356 In any event, as mentioned above in the context of novelty, at the relevant date of the Patent, the skilled person had a good understanding of spore-forming bacteria. Further, the Patent provides a clear disclosure enabling the skilled person to identify, in case of any doubt, whether a given bacterium is spore-forming within the meaning of the claimed invention, namely by the criterion of resistance to 3% chloroform (see, e.g., Example 6, page 81, lines 15-16 of the application as filed, also Example 18, page 106, lines 14-15).

357 The Opponents also allege that it would have been an undue burden for the skilled person to identify bacteria of Clostridium clusters IV and XIVa. That, however is clearly not the case, because these taxonomic groups were commonly known and numerous representative bacteria belonging to these groups were also commonly known to the skilled person in the relevant technical area by the effective date of the Patent (see, e.g., the examples and methods disclosed already in D22, Fig. 2, the document in which these subsequently widely accepted taxonomical groupings were first proposed).

358 The skilled person able to identify and assign bacteria to Clostridium clusters IV and XIVa at least on the basis of well-established methods for identifying and comparing ribosomal RNA sequences. See, e.g., D22 (page 813, column 1), the introduction to D9 (page 2089, column 1), and D28 (page 2, column 2, last two paragraphs) for examples of this routine approach for identifying taxonomic units by 16S rRNA analysis (cf. "*operative taxonomic units*", "*OTUs*" in D28, page 2, column 2, penultimate paragraph). In D28, e.g., the bacteria identified in this way expressly include bacteria of "Clostridium clusters IV and XIVa" (page 2, column 2, last paragraph, Table 2, Fig. 2).

359 At the effective date of the Patent, the expression "*bacteria of Clostridium clusters IV and XIVa*" was thus clearly meaningful, and such bacteria were entirely accessible in practice, to the skilled person having experience in the relevant technical area. Taking due account of the relevant skilled person's knowledge and experience, the Patent provides sufficient information for the skilled person to carry out the claimed invention in respect of the term "*bacteria of Clostridium clusters IV and XIVa*".

360 The prior art on file clearly illustrates that it was technically meaningful and indeed common practice in the relevant field to refer to this particular type of bacteria in terms the generic expression "*Clostridium clusters IV and XIVa*". Indeed, as demonstrated, e.g., by D68, this has not changed today – in particular in connection with precisely the pharmaceutical compositions which are based upon the present invention (see, e.g., D68, page 6, column 1 and 2). The present invention is not limited to specific representatives of these clusters. Once provided with the groundbreaking insight as disclosed in the Patent that it is, in particular, spore-forming bacteria of Clostridium clusters IV and XIVa which are capable of inducing Foxp3-positive regulatory T cells, the skilled person was enabled to prepare compositions for therapeutic use based upon various selections and combinations from these groups of bacteria. In view of the technical nature and also the general implications and significance of the present invention, the reference to Clostridium clusters IV and XIVa – in conjunction with the remaining features of claim 1 – is technically the most pertinent and meaningful way to define the relevant bacteria.

361 For completeness, we note that the Patent also enables the skilled person to assay bacteria for their ability to induce Foxp3 positive regulatory T cells, e.g., by administering them to GF mice and analysing the ratio of Foxp3+ cells in CD4+

lymphocytes by flow cytometry (see, e.g., Example 7 and the results presented in Figures 13 and 14).

362 Regarding the Opponents' attacks attempting to cast doubt upon the role of Tregs in combating infectious diseases, we note that no serious doubt has in fact been made out. Opponents have argued that compositions as claimed might be deleterious, but we note that this is the case for most if not all drugs in certain circumstances, e.g., if administered in inappropriate amounts or to inappropriate patient groups. The present claims are directed to specific uses for the treatment of the recited diseases involving the induction of Foxp3- positive regulatory T cells, i.e., to uses and patient groups in which this is appropriate. The Opponents merely speculated about the possible existence of some cases in which regulatory T cells may be detrimental, but have not discharged their burden of proof of establishing concrete doubts, substantiated by verifiable facts, that the specific use as claimed cannot be carried out.

363 To the contrary, as already established an examination, it is entirely credible that the specific uses as claimed exist, and can be carried out without undue burden by the skilled person in accordance with the legal standards established by the case law of the Boards of Appeal under Art. 83 and 100 (b) EPC. In conclusion, the Patent discloses the invention in a manner sufficiently clear and complete for it to be carried out by a person skilled in the art.

## 9 Conclusion

364 The oppositions lack merit and are to be rejected.

## 10 Auxiliary claim requests

365 The following auxiliary claim requests are filed herewith, in which amendments are indicated relative to the claims as granted.

### 10.1 Auxiliary Request 1

366 In Auxiliary Request 1, claim 1 has been amended to recite that the bacteria belonging to Clostridium clusters IV and XIVa are in spore form. This amendment has

basis on page 31, lines 2-3 of the application as filed and paragraph [0019] of the second priority document and its translation D66.

367 As this feature corresponds to dependent claim 7 as granted, that claim has been deleted, and the numbering and dependencies of subsequent claims have been updated accordingly.

**10.2 Auxiliary Request 2**

368 In Auxiliary Request 2, claim 1 has been amended to recite that the infectious disease involves immunopathological tissue damage. This amendment has basis on page 37, lines 18-26, in particular lines 25-26 of the application as filed, and in paragraphs [0028] and [0029] of the second priority document / D66.

**10.3 Auxiliary Request 3**

369 In Auxiliary Request 3, the alternative "*infectious disease*" has been removed from claim 1. This amendment merely limits the claim scope without introducing any added subject matter.

**10.4 Auxiliary Request 4**

370 In Auxiliary Request 4, claim 1 has been amended to recite that the composition comprises bacteria belonging to Clostridium clusters IV and XIVa and another Clostridium cluster in combination. This amendment has basis on page 28, lines 16-17 and 21-26, to page 29, line 1 of the application as filed and paragraph [0018] of the second priority document / D66.

371 Claim 4 as granted has been deleted and the numbering and dependencies of subsequent claims have been updated accordingly. Claim 6 has been amended to mention the bacteria of another Clostridium cluster for consistency with amended claim 1.

**10.5 Auxiliary Request 5**

372 In Auxiliary Request 5, claim 1 has been amended to recite that the composition is formulated for oral administration as a delayed release dosage unit having a coating material suitable for delayed release. This amendment has basis in the original disclosure on page 39, lines 9-14 and 17-18, and on page 40, lines 15-17 and 21-23, and accordingly in paragraphs [0032]-[0034] of the second priority document / D66.

## 10.6 Auxiliary Request 6

373 In Auxiliary Request 6, claim 1 has been amended to recite that the composition is administered in an amount of 0.01-10 mg/kg body weight per administration. This amendment has basis in the original disclosure on page 48, lines 3-6 (paragraph 49 of the second priority document / D66).

## 10.7 Auxiliary Request 7

374 In Auxiliary Request 7, the alternatives "*infectious disease*" and "*autoimmune disease*" have been removed from claim 1. This amendment merely limits the claim scope without introducing any added subject matter. Accordingly, dependent claim 2 as granted has been removed, and the remaining claims and dependencies have been updated.



OGLE, James Matthew, PhD
European Patent Attorney
Hoffmann Eitle PartmbB
Association No. 151

Enc. Consolidated list of documents
Documents D66-D77
Auxiliary Requests 1-7