# EXHIBIT B

Intellectual Property Law
Europe and USA

EIP
Fairfax House
15 Fulwood Place
London WC1V 6HU
United Kingdom

eip.com

European Patent Office
80298 Munich
Germany

Our Ref: E1351.100(F).EPW 4 May 2016 

Dear Sirs,

**European Patent Application No. 11728077.6**
**In the Name of The University of Tokyo**

The following is responsive to the Official Communication of the 12 February 2016.

Here, the Examining Division expresses the opinion that documents cited in a Third Party observation (TPO) are relevant for assessing the novelty and inventive step of the present claims and requests that the Applicant comment on this matter as well as a supposed "discrepancy between A1 as cited in the observation and the data sent by the Applicant during Examination Proceedings".

**Amendments**

Claim 1 has now been amended to specify that the bacteria belonging to Clostridium clusters IV and XIVa are spore-forming.

Support for this amendment may be found, for example, page 31 (lines 2-3), page 46 (lines 21-24), Example 18 (at pages 106 et seq.) and page 109 (lines 10-11).

It is submitted that no objections arise under Article 123(2) EPC in the light of the above submissions and observations.

**Threshold remarks**

In §§ 2.8 and 2.9 of the TPO the Third Party asserts that the Applicant is "attempting to mislead" and "deceive" so that the Examiner will "inadvertently allow" the claims.

This appears to be an attempt to undermine the mutual professional respect required of Examiner and representative during these proceedings and seems to breach the Code of Conduct of the Institute of Professional Representatives before the European Patent Office, which states (§§ 5 and 6 of the Code of Conduct of the Institute of Professional Representatives before the European Patent Office) that:

*"... a member may not speak of another member in discourteous or offensive terms."*

2013

**Bath** +44 (0)1225 337 843 **Cardiff** +44 (0)29 2023 0509 **Düsseldorf** +49 (0)211 9595 8500 **Leeds** +44 (0)113 245 7981 **London** +44 (0)20 7440 9510 **San Diego*** +1 619-795-1300 **Tokyo**** +81 (0)3 6457 9808

EIP Europe LLP, a limited liability partnership registered in England and Wales Nº OC345900. Registered office: Fairfax House, 15 Fulwood Place, London, WC1V 6HU. VAT Registration Nº 971 9863 63. Regulated by IPREG. EIP® and the EIP logo are registered trademarks used under licence by the separate legal entities EIP Europe LLP and EIP US LLP. *Office of EIP US LLP. **Representative office.

and

*"In all dealings with the European Patent Office and its employees, a member shall act courteously, and shall do everything possible to uphold the good reputation of this Institute and its members."*

The requested comments now follow:

**1. Document A1 (Qiu *et al.* 2013)**

As previously submitted, the ability to "induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells" defines a distinct functional subclass of bacteria belonging to Clostridium clusters IV and XIVa.

In particular, and as previously submitted, the ability to induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells is not an inherent feature of the clostridial strains described in the art, and in particular is not an inherent feature of *Faecalibacterium prausnitzii* as described in document D2.

This has already been shown by the data presented in our previous responses of the 25 February 2014 and 29 September 2014. In this regard, we would stress that Figure 1 as set out in our response of the 25 February 2014 shows that *Faecalibacterium prausnitzii* does not in fact increase Treg induction at all. Rather, the data show that *F. prausnitzii* provides no additional Treg induction above and beyond the baseline level that exists in germ-free animals. Thus, *F. prausnitzii* has no measurable effects on Treg induction: the issue of whether any increase is "significant" is irrelevant, since there is no increase at all.

**There is no discrepancy between this data and that set out in A1, because it has since been shown that different *Faecalibacterium prausnitzii* strains exhibit marked heterogeneity in immunomodulatory properties.**

For example, Rossi *et al.* (2015) Scientific Reports |6:18507 | DOI: 10.1038/srep18507 (attached as E1) tested five different *F. prausnitzii* strains and showed that they all had different capacities to induce IL-10 and other cytokines (see Figure 1).

Significantly, *F. prausnitzii* A2-165, the strain described in D2, is shown to not induce Foxp3-positive regulatory T cells (see Figure 8B), a finding which is perfectly consistent with the data presented in our previous responses of the 25 February 2014 and 29 September 2014.

Thus, there is no discrepancy between A1 and the data cited by Applicant during the Examination Proceedings.

As a concluding remark, in the light of the foregoing, it is submitted that the allegations of attempts to "deceive" and "mislead" the Examiner (§§ 2.8 and 2.9 of the TPO) are clearly unfounded.

**2. Novelty**

**2.1 General considerations**

The claims presently pending are cast in the purpose-related product format as provided by Art 54(5) EPC. In particular, the claims require *inter alia*:

- the treatment or prevention of *infectious disease, autoimmune disease or allergic disease.*

This specified therapeutic method feature is to be interpreted as a *functional technical feature* of the claims, and accordingly the claims are novel in circumstances where this technical feature has not previously been disclosed in the prior art (see **G 2/08**, II.5).

As further stated in the Headnote to **G 6/88**:

A claim to the use of a known compound for a particular purpose, which is based on a technical effect which is described in the patent, should be interpreted as including that technical effect as a functional technical feature, and is accordingly not open to objection under Article 54(1) EPC provided that such technical feature has not previously been made available to the public.

**2.2 Document A2 (US 5,599,795)**

**2.2.1 No enabling disclosure of the claimed medical use**

The novelty attack based on A2 rests on the assertion that:

*"… document A2 clearly discloses the use of a composition … for the treatment of an <u>autoimmune disease</u> …"*

[TPO, §3.1.1, emphasis added]

However, it must be noted that A2 is novelty destroying *only if the teaching it contains is reproducible*.

In this regard, the same standards developed to test sufficiency under Article 83 EPC apply. As explained in **T 1437/07**:

The need for an enabling disclosure in the prior art is in conformity with the requirement expressed in Article 83 EPC that patent applications or patents have to disclose the invention in a manner sufficiently clear and complete for it to be carried out by a person skilled in the art. Given that the requirement of sufficiency of disclosure is the same for the prior art and for a patent application or a patent, it is also necessary that the same standard is applied in deciding whether or not this requirement is fulfilled.

In the case of a medical use (see *General considerations*, above), the test for enablement requires that the teaching of the prior art be *plausible* (**T 1593/05**), i.e. it must be *credible* that the effects at issue have actually been achieved (**T 1437/07**). In this regard, it is important to note that a *simple verbal statement of a particular medical use in the prior art is not enough*.

As stated in **T 1593/05** (§ 5, emphasis added):

For the acceptance of a sufficient disclosure of a therapeutic application, the application or the patent and/or common general knowledge <u>must provide some information rendering it technically plausible</u> for the skilled person that the claimed compounds can be applied for the claimed therapeutic use …

As stated in **T 1437/07** (§ 26, emphasis added):

In accordance with the principles developed by the case law in the framework of the evaluation of the requirements of Article 83 EPC in the case of a medical use, the skilled person should not only be able to carry out the teaching of … [the prior art] …, but it should also be credible that the effect at issue … has been achieved.

As further explained in **T 0609/02** (emphases added):

The boards of appeal have accepted that for a sufficient disclosure of a therapeutic application, it is not always necessary that results of applying the claimed composition in clinical trials, or at least to animals are reported. Yet, this does not mean that a simple verbal statement in a patent specification that compound X may be used to treat disease Y is enough to ensure sufficiency of disclosure in relation to a claim to a pharmaceutical. It is required that the patent provides some information in the form of, for example, experimental tests, to the avail that the claimed compound has a direct effect on a metabolic mechanism specifically involved in the disease, this mechanism being either known from the prior art or demonstrated in the patent per se.

Thus, in assessing the relevance of A2 to the novelty of the claims, it is necessary to determine whether the relevant disclosure is *plausible*, in the sense that the disclosure makes *credible* that the treatment of autoimmune disease *has actually been achieved*.

In this respect, it is submitted that A2 does not in fact contain plausible teachings that render this treatment credible, *inter alia* because:

- the relevant disclosure in A2 is *purely prophetic*;
- A2 contains *no experimental data* of any kind; and
- no information is presented as to the *outcome* of the proposed treatment.

Thus, the relevant disclosure of A2 is *merely speculative* and amounts to nothing more than *simple verbal statements* of the kind held to be unsuitable as a basis for an enabling disclosure of a medical use in the case law of the boards of appeal.

It is therefore submitted that A2 cannot be regarded as a *plausible or credible* teaching of the treatment of autoimmune disease, and so does not anticipate the subject matter claimed.

**2.2.2 No clear and unmistakable teaching of the required functional subclass**

The pending claims require *inter alia* bacteria which induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells, as an active ingredient.

As explained in §1 (above), this feature of the claims defines a distinct functional subclass of bacteria. Moreover, this functional attribute is not an inherent feature of clostridial strains from clusters IV and XIVa.

There is no disclosure in A2 of this functional attribute, and so A2 does not anticipate the subject matter claimed.

### 2.2.3 No teaching of the required morphological class

The pending claims now require that the bacteria be *spore-forming* bacteria.

The Third Party's novelty attack is based on the argument that the bacteria described in A2:

"… include bacteria from Clostridium cluster IV (e.g. *Ruminococcus bromii* as well as *Faecalibacterium prausnitzii*) and bacteria from Clostridium cluster XIVa (e.g. *Eubacterium rectale*, *Ruminococcus obeum*, and *Ruminococcus gnavus*).

However, these bacteria are <u>non</u>-spore-forming.

This is evidenced by:

Foditsch *et al*. (2014) Isolation and Characterization of *Faecalibacterium prausnitzii* from Calves and Piglets PLOS ONE 1 DOI:10.1371 (attached as E2)

*F. prausnitzii* (formally *Fusobacterium prausnitzii*) is a Gram-positive, nonmotile, <u>non-spore-forming</u>, butyrate-producer bacterium belonging to the Firmicutes phylum.

[E2, page 2, third complete paragraph, emphasis added]

Hata and Smith (2004) Blood group B degrading activity of *Ruminococcus gnavus* alpha-galactosidase Artif Cells Blood Substit Immobil Biotechnol. 32(2): 263-74 (abstract attached as E3)

*Ruminococcus gnavus* is a Gram positive, <u>nonspore-forming</u> obligate anaerobe normally found in the human alimentary tract.

[E3, abstract, emphasis added]

*Ruminococcus* spp. do not form spores: see e.g. https://microbewiki.kenyon.edu/index.php/Ruminococcus

*Eubacterium rectale* is non-spore former: see e.g. http://ijs.microbiologyresearch.org/content/journal/ijsem/10.1099/ijsem.0.000788#tab2

We would also note that while the Third Party has not mentioned the cluster XIVa *Coprococcus eutactus*, it should be noted that this bacterium is also a non-spore-former:

*Lachnospiraceae* (including *Coporococcus* spp.) are non spore formers: https://books.google.com/books?id=ZpLaBAAAQBAJ&pg=PA158&lpg=PA158&dq=lachnospiraceae

+non-spore&source=bl&ots=hT2zRq_LB1&sig=4r7agdj-FVz90TVf7sr_GRPb_00&hl=en&sa=X&ved=0ahUKEwifoIeSrLTLAhVDt4MKHdV7BgwQ6AEIPTAG#v=onepage&q=lachnospiraceae%20non-spore&f=false

Thus, and without prejudice to the generality of the submissions made in §§ 2.1, 2.2.1 and 2.2.2 (above), A2 does not anticipate the subject matter claimed.

**2.3 Document A3 (Abrams, R. S.: "Open Label, Uncontrolled Trial of Bowel Sterilization and Repopulation with Normal Bowel Flora for Treatment of Inflammatory Bowel Disease" in Current Therapeutic Research, December 1997, val. 58, no. 12, pages 1001-1012)**

**2.3.1 No enabling disclosure of the claimed medical use**

The novelty attack based on A3 rests on the assertion that it:

*"… discloses … the treatment of* *__inflammatory bowel disease__* *…"*

[TPO, §3.1.2, emphasis added]

However, A3 does not demonstrate a therapeutic effect of the bacterial compositions in the IBD patients treated.

Rather, the data obtained showed that 50% of the patients treated *did not respond to treatment*.

Moreover, no conclusion can be drawn with regard to the actual existence of a therapeutic effect from the observed clinical remission in three of the patients treated *since this could be explained by spontaneous remission*. As acknowledged in A3 at page 1010 (first sentence of last paragraph), clinical remissions are common in cases of IBD:

> Clinical remissions, some lasting for many years, are commonly reported in cases of IBD.

Moreover, the study was neither masked nor controlled:

> The strength of this study was also limited because it was not masked. In addition, no attempt was made to study a controlled series of IBD patients who would be treated with antibiotics alone, without bacterial replacement therapy.

[A3, page 1010, last complete paragraph]

In this regard it should be noted that even the observed remissions were subject to the caveat that measurement of clinical remission "may be inaccurate", since objective measures (such as cytokine profiles and histologic markers) were *not tested*:

However, measurement of clinical remission may be inaccurate, because remissions are usually determined by disease activity indices that are based mostly on clinical observations and patients' subjective evaluations. Histologic activity may continue at a subclinical level. There is a paucity of data in the literature regarding the use of more objective measures of remission, such as cytokine profiles and histologic appearance, to determine the extent and completeness of remissions. None of these measures were tested in this study.

[A3, paragraph bridging pp. 1010 and 1011, emphases added]

As explained in **T 0385/07** (§ 9, emphasis added):

… information in a citation that a medicament was undergoing a clinical phase evaluation for a specific therapeutic application was not prejudicial to the novelty of a claim directed to the same therapeutic application of the same medicament if the content of said citation did not allow any conclusion to be drawn with regard to the actual existence of a therapeutic effect …

Finally, and as explained in more detail in §3.1.1 (below), the skilled person is taught that the remission rates were *no better* than those previously obtained by other workers *using bacterial cocktails which did not contain any clostridial strains.* For example, at page 1002 of A3 it is explained that:

In an open-label, uncontrolled manner, McCann (personal communication, Michael McCann, 1977) sporadically treated over a 20-year period more than 30 IBD patients who had persistent pain or bloody diarrhea despite conventional therapy (prednisone, azathioprine, 5-aminosalicylic acid [5-ASA] compounds, cyclosporine). McCann used antibiotics and mechanical cleansing of the intestine, followed by bacterial replacement, orally and rectally, with *E coli, Bifidobacterium,* and *Lactobacillus.* Approximately 50% of the patients achieved full clinical remission lasting from 6 weeks to 13 years.[16,17] Some patients relapsed and were retreated using the same method. None of the patients suffered ill effects from the treatments, and no toxicity was reported in responders or nonresponders.

[emphasis added]

Thus, no conclusion could possibly have been drawn with regard to the actual existence of a therapeutic effect.

It is therefore submitted that A3 does not disclose the treatment of IBD, and so does not anticipate the subject matter claimed.

### 2.3.2 No clear and unmistakable teaching of cluster IV-XIVa combinations

The pending claims require *inter alia* bacteria belonging to Clostridium clusters IV and XIVa, in combination, and as an active ingredient. As established in our previous responses, the bacterial combinations claimed are *not arbitrary* (but rather are associated with *important technical effects*).

As explained in the *CLBA* (page 107):

> A claimed subject-matter would lack novelty only if a "clear and unmistakable teaching" of a combination of the claimed features could be found in a prior art disclosure (see for example unpublished decisions T 450/89, T 677/91, T 447/92 and T 511/92).

Moreover, in order for a prior art document to be novelty-destroying, it is necessary that <u>all</u> features of the claim be <u>clearly</u> and <u>directly</u> derivable from the prior art.

As stated in **T 411/98**:

A claimed subject-matter would lack novelty only if it were derivable as a whole directly and unambiguously from a prior art disclosure and if a "clear and unmistakable teaching" of the combination of all claimed features (and not only the essential ones) could be found in said disclosure.

In this regard, we would note that there is *no direct and unambiguous disclosure or suggestion* in A3 of the use of bacteria belonging to Clostridium clusters IV and XIVa in combination as active ingredient for the treatment of IBD.

This follows from the fact that A3 teaches the administration of "<u>12</u> specific strains of anaerobes and 1 strain of *E. coli*", by reference to a list of <u>22</u> different anaerobic species:

> The replacement bacteria consisted of 12 specific strains of anaerobes and 1 strain of *E coli.* Each strain of replacement bacteria has been well characterized, with descriptions in *Bergey's Manual of Systematic Bacteriology,*[23] and was obtained from persons believed to be free of major illness. Species included the following anaerobes: *Bacteroides caccae, distasonis, fragilis, stercoris, thetaiotaomicron, uniformis, vulgatus; Eubacterium aerofaciens rectale; Fusobacterium prausnitzii; Bifidobacterium adolescentis, longum; Lactobacillus acidophilus; Coprococcus eutactus; Ruminococcus gnavus, bromii, obeum; Streptococcus, intermedius, oralis, salivarius; Veillonella parvula.*

[A3, page 1003, first paragraph]

In this regard it is important to note that:

- the list of 22 species is itself explicitly stated to be non-exhaustive ("species included …");
- A3 is silent as to what particular combination of bacterial strains selected from the list of at least 22 different bacterial species was actually used to generate the mixture of the 12 anaerobe strains used for "bacterial replacement therapy", and *does not specify that the 12*

*strains of anaerobes should include bacteria belonging to Clostridium clusters IV and XIVa in combination.*

Moreover, A3 makes clear that it was not even known whether the bacteria selected were *even viable* prior to administration:

Although bacterial species vary in size, no calculations were made to relate size and optical density to the concentration of any of the species, and no colony counts were done. Neither was it determined what proportion of bacteria was alive.

[A3, page 1004, end of second complete paragraph]

It is therefore submitted that A3 does not disclose bacteria belonging to Clostridium clusters IV and XIVa, in combination, as an active ingredient, and so does not anticipate the subject matter claimed.

**2.3.3 No clear and unmistakable teaching of the required functional subclass**

The pending claims require *inter alia* bacteria which induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells, as an active ingredient.

As explained in §1 (above), this feature of the claims defines a distinct functional subclass of bacteria. Moreover, this functional attribute is not an inherent feature of clostridial strains from clusters IV and XIVa.

There is no disclosure in A3 of this functional attribute, and so A3 does not anticipate the subject matter claimed.

**2.3.4 No teaching of the required morphological class**

The points made in §2.2.3 apply *mutatis mutandis*.

Thus, and without prejudice to the generality of the submissions made in §§ 2.1, 2.3.1, 2.3.2 and 2.3.3 (above), A3 does not anticipate the subject matter claimed.

**3. <u>Inventive step</u>**

**3.1 Documents A2 and A3**

**3.1.1 Could/would analysis**

As explained in the *Guidelines* (G-VII-5.3):

… the point is not whether the skilled person could have arrived at the invention by adapting or modifying the closest prior art, but whether he **would have done** so because the prior art incited him to do so in the hope of solving the objective technical problem or in expectation of some improvement or advantage …

[emphasis in original]

As further explained in the *Guidelines* (G-VII-4):

As a general rule, there is an inventive step if the prior art leads the person skilled in the art away from the procedure proposed by the invention. This applies in particular when the skilled person would not even consider carrying out experiments to determine whether these were alternatives to the known way of overcoming a real or imagined technical obstacle.

[emphasis added]

In the present case, it is submitted that the skilled person would in fact have been *led away* from the subject matter claimed by A2 and A3, and so would not have arrived at the invention claimed.

This follows from the fact that A2 and A3 would have been understood to be technically closely related by the skilled person, both publications being based on work done by Richard Abrams (sole author of A3 and joint inventor of A2). Thus, documents A2 and A3 would have been read together.

When so read, the skilled person would have learned that the remission rates were no better than those previously obtained by other workers *using bacterial cocktails which did not contain any clostridial strains*.

For example, at page 1002 of A3 it is explained that:

In an open-label, uncontrolled manner, McCann (personal communication, Michael McCann, 1977) sporadically treated over a 20-year period more than 30 IBD patients who had persistent pain or bloody diarrhea despite conventional therapy (prednisone, azathioprine, 5-aminosalicylic acid [5-ASA] compounds, cyclosporine). McCann used antibiotics and mechanical cleansing of the intestine, followed by bacterial replacement, orally and rectally, with *E coli, Bifidobacterium,* and *Lactobacillus*. Approximately 50% of the patients achieved full clinical remission lasting from 6 weeks to 13 years.[16,17] Some patients relapsed and were retreated using the same method. None of the patients suffered ill effects from the treatments, and no toxicity was reported in responders or nonresponders.

[emphasis added]

Consequently, the skilled person *would not have been incited* by A2 and A3 to treat IBD with bacterial cocktails containing the clostridial strains as claimed.

It is therefore submitted that the subject matter claimed is inventive over A2 and A3.

### 3.1.2 No reasonable expectation of success

As explained in the EPO's "Case Law of the Boards of Appeal of the European Patent Office" (Seventh Edition, September 2013 ("CLBA"):

7.1. Reasonable expectation of success

In accordance with the case law of the boards of appeal, a course of action could be considered obvious within the meaning of Art. 56 EPC if the skilled person would have carried it out in expectation of some improvement or advantage (T 2/83, OJ 1984, 265). In other words, obviousness was not only at hand when the results were clearly predictable but also when there was a reasonable expectation of success (T 149/93). It is not necessary to establish that the success of an envisaged solution of a technical problem was predictable with certainty. In order to render a solution obvious it is sufficient to establish that the skilled person would have followed the teaching of the prior art with a reasonable expectation of success (T 249/88, T 1053/93, T 318/02, T 1877/08).

[*CLBA*, page 184]

In the present case, it is submitted that the person skilled in the art *would not have had a reasonable expectation of success* in treating or preventing infectious disease, autoimmune disease or allergic disease using the particular combination of clostridial cluster strains claimed.

In particular, there would have been no reasonable expectation of success in view of the failure of A2 and A3 to disclose or describe:

- any physiological effect or mechanism relevant to the claimed therapeutic application;
- any data relating to the outcome of the treatments described;
- any information relating to the significance of the relevant clostridia cluster IV and XIVa strains, a deficiency which is exacerbated by the facts that:

(i) the remission rates were no better than those previously obtained by other workers using bacterial cocktails *which did not contain any clostridial strains* (see §3.1.1, above); and

(ii) A3 *does not specify that the 12 strains of anaerobes should include bacteria belonging to Clostridium clusters IV and XIVa in combination*;

- any information relating to the ability of the relevant clostridia cluster IV and XIVa strains to colonize the gut after administration, which deficiency is exacerbated by the fact that A3 explicitly states that: "the presence of the new bacteria in the colon or feces was not tested" (see A3 at page 1010, lines 6-7);
- any information confirming that *viable* clostridia cluster IV and XIVa strains were administered (as explained in §2.3.2 (above), A3 makes clear that it was not even known whether any of the bacteria selected were even viable when administered).

It is therefore submitted that the subject matter claimed is inventive over A2 and A3.

### 3.1.3 No teaching of the functional subclass

As explained in §§ 2.2.2 and 2.3.3 (above), A2 and A3 are silent as to the importance of the ability of the bacteria to *induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells*.

Nothing in A2 and A3 would have led the skilled person to select such bacteria.

It is therefore submitted that the subject matter claimed is inventive over A2 and A3.

#### 3.1.4 No teaching of the morphological class

As explained in §§ 2.2.3 and 2.3.4 (above), A2 and A3 are silent as to thespore-forming ability of the bacteria.

Nothing in A2 and A3 would have led the skilled person to select such bacteria.

It is therefore submitted that the subject matter claimed is inventive over A2 and A3.

### 3.2 Document A4

The pending claims require *inter alia* bacteria which:

(a) induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells as an active ingredient; and

(b) are *spore-forming*.

As explained in §§ 1, 2.2.3 and 2.3.4 (above), these features define a distinct functional and morphological class of bacteria.

Nothing in A4 would have led the skilled person to select such bacteria. Rather, and in relation to the requirement that the bacteria induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells, A4 teaches that a *quite different* functional attribute is determinative of efficacy in the relevant medical uses, viz. the ability to produce *butyric acid*.

Moreover, the pending claims require *inter alia* bacteria belonging to Clostridium clusters IV and XIVa, *in combination*, and as an *active ingredient*. As established in our previous responses, this particular bacterial combination is *not arbitrary* (but rather is associated with *important technical effects*).

Nothing in A4 points to this particular combination: the only supporting technical evidence presented in A4 is that set out in the referenced Sokol *et al.* (2008) (D2 of the current proceedings) and Eeckhaut *et al.* (2009) (a copy of which is attached as E4).

Neither of these documents disclose or suggest the *combinations* now claimed. Indeed, it should be noted that E4 indicates that *Butyricicoccus pullicaecorum* <u>alone</u> might be useful, while D2 teaches that *F. prausnitzii* acts independently of butyrate (see e.g. the paragraph bridging pages 16734 and 16735). In this regard, it should be noted that A4 clearly *teaches away* from strain combinations as claimed, teaching instead that a <u>single</u> probiotic strain would be ideal. As stated at page 142 (left hand column):

> "An ideal probiotic would thus be a colonizing <u>bacterium</u> …"

[emphasis added]

It should also be noted that the ability to induce proliferation or accumulation of transcription factor Foxp3-positive regulatory T cells is not an inherent feature of butyrate-producing clostridial strains: as explained in §1 (above), *F. prausnitzii* does not induce Foxp3-positive regulatory T cells (see Figure 8B of E1), yet does produce butyrate (to the extent that culture supernatants were toxic to hDCs at a concentration of 10% v/v - see E1 at page 3, lines 4-5 of second paragraph).

Thus, A4 *leads away* from the claimed subject matter and so the subject matter claimed is clearly inventive over A4

**4. Alleged lack of "technical contribution"**

We have already shown that the use of bacteria belonging to Clostridium clusters IV and XIVa, in combination, and as an active ingredient is associated with important technical effects, and in particular we have already filed data comparing: (i) GF-mice, (ii) mice colonized with bacteria from cluster IV alone and iii) mice colonized with bacteria of both clusters (see our response of the 27 August 2015). This data clearly shows that the bacterial combinations claimed are *not* arbitrary, but rather are associated with important technical effects, including *enhanced induction of Foxp3-positive Treg cells*.

The induction of Foxp3-positive Treg cells is a useful surrogate for therapeutic efficacy, as explained in the application as originally filed (see e.g. bridging pages 3 and 4), and they are involved not only in autoimmune and allergic diseases, but also infectious disease.

For example, in Sanchez and Yang (2011) "The Role of Natural Regulatory T cells in Infection" *Immunol Res*. 49(0): 124–134 (attached as E5), the authors state:

“For example, with *L. major* infection the downregulation of the effector response by TReg leads to concomitant immunity, which is lost by removal of TReg. This has also been demonstrated with a murine model of infection with the fungus *Candida albicans* where the presence of TReg was required for resistance to reinfection. Additionally, similar results have been observed in infection with a lose-dose of HSV1.”

“In addition to allowing for the development of protective immunity, TReg can benefit the host by reducing immune-mediated pathology that can occur as collateral damage associated with a strong anti-pathogen immune response. This role for TReg in protecting against immune-mediated damage has been demonstrated in models of pulmonary inflammation caused by *Pneumocystis pneumonia*, inflammatory eye lesions with HSV, liver pathology in *Schistosoma mansoni* infection and stomach pathology with *Candida albicans* where depletion of TReg leads to enhanced pathology.”

Reference is also made to Keynan *et al*. (2008) "The Role of Regulatory T Cells in Chronic and Acute Viral Infections" *Clinical Infectious Diseases* 46: 1046-1052 (attached as E6), and in particular to the highlighted portions thereof.

Further reference is also made to O'Garra *et al*. (2004) "IL-10–producing and naturally occurring CD4+ Tregs: limiting collateral damage" *J. Clin. Invest.* 114:1372–1378 (attached as E7), and in particular to the highlighted portions thereof.

It is submitted that the application is in order for grant, but by way of precaution, oral proceedings are requested in circumstances where the Examiner is minded to refuse the application without providing further opportunity for written prosecution and/or telephonic consultation. However, in the interests

of expediting prosecution, the Examiner is cordially invited to contact Dr. Vincent A. Price by telephone if any objections remain: he can be contacted at (+44) 1892 662008.

Yours faithfully,

//Electronically Signed//

SHARPLES, Andrew
Authorised Representative
EIP